468 P.2d 580

**The STATE of Arizona, ex rel. Moise BERGER, Maricopa County Attorney, Petitioner,**

**v.**

**The SUPERIOR COURT of the State of Arizona IN AND FOR the COUNTY OF MARICOPA, the Honorable Morris Rozar, Judge thereof, and Terryll Scott Merritt, Real Party In Interest, Respondent.**

No. 9891.

Supreme Court of Arizona,
In Banc.

April 29, 1970.

Rehearing Denied June 2, 1970.

Moise Berger, Maricopa County Atty., By H. Charles Eckerman, Phoenix, for petitioner.

Michael Hurley, Phoenix, for respondent.

HAYS, Justice.

Terryll Scott Merritt, real party in interest and defendant below, was charged in the Tolleson Justice Court with the crimes of burglary and grand theft. Thereafter, on January 9, 1969, the Maricopa County Public Defender was appointed to represent defendant at the preliminary hearing and in all further proceedings.

The matter was set for trial on November 6, 1969, at which time a voluntariness hearing was held, outside of the presence of the jury, to determine whether certain alleged statements of the defendant were admissible at trial. After hearing the evidence, the Honorable Morris Rozar, Judge of the Maricopa County Superior Court, ruled that the challenged statements were involuntarily made and were thus inadmissible. The State then petitioned this Court for a Writ of Certiorari, which we granted on December 23, 1969. Having reviewed the record of the voluntariness hearing below, we remand this cause to the trial court for proceedings not inconsistent with this decision.

At the voluntariness hearing, sheriff's deputies Dave Arellanes, Jim Kepner and Tom Ennis testified as to certain statements which the defendant allegedly made to them after defendant had appeared before the justice of the peace, been incarcerated, and had counsel appointed for him. Pursuant to requests by the defendant sent from the jail indicating he wanted to talk about his case, Arellanes and Kepner engaged in three separate conversations with defendant on the days of January 12th, 19th and 20th, 1969. Immediately before each of these conversations, the sheriff's deputies read to defendant the standard Miranda warnings. These warnings were contained on a printed card, which read as follows:

"You have the right to remain silent.

Anything you say can be used against you in a court of law.

You have the right to the presence of an attorney to assist you prior to questioning, and to be with you during questioning, if you so desire.

If you cannot afford an attorney you have the right to have an attorney appointed for you prior to questioning.
Do you understand these rights?
Will you voluntarily answer my questions?"

On each occasion defendant initialed or signed the printed card prior to making any statements. On each occasion defendant made oral statements to the deputies concerning the alleged crimes. Defendant's counsel was neither present at nor contacted prior to any of the conversations. The sheriff's deputies were aware that a deputy public defender had previously been appointed in defendant's behalf.

In his response to the State's petition for Writ of Certiorari, defendant acknowledges that Judge Rozar's ruling was based on the Court of Appeals decision of State v. Herman, 3 Ariz.App. 323, 414 P.2d 172 (1966), a case with facts quite similar to the present case. *Herman* holds that where a defendant has retained counsel from the time of his arraignment, "the defendant may not be questioned outside the presence of counsel without counsel's permission." 3 Ariz.App. at 327, 414 P.2d at 176. The decision concludes that statements elicited from a defendant, without the presence or approval of defendant's counsel, are inadmissible as a matter of law. By our holding today we expressly overrule that portion of State v. Herman which is inconsistent herewith.

Our Federal Courts have consistently held that voluntary confessions are not barred by the Fifth Amendment to the U. S. Constitution. A confession is not made involuntary by the mere fact that it was made outside the presence of an attorney. In enumerating its standards for voluntary confessions in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U. S. Supreme Court stated the following:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element of law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he

can be interrogated. There is no requirement that the police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

Thus, Miranda recognizes that a suspect may waive his Fifth Amendment rights at any time, provided the waiver is voluntary, knowing and intelligent.

In Reinke v. United States, 405 F.2d 228 (9th Cir. 1968), the Ninth Circuit Court of Appeals reached the same conclusion which we reach today. In Reinke the defendant was convicted, in the U. S. District Court for the District of Arizona, of interstate transportation of a stolen motor vehicle. While in jail, and after his attorney had been appointed, he made incriminating statements to an FBI agent. On appeal, the Ninth Circuit held that the statements were voluntary and admissible, even though the agent knew that counsel had been appointed and failed to obtain counsel's permission to proceed with the interview, because the accused had affirmatively initiated the interview, the appropriate Miranda warnings had been given, and the accused fully understood his Miranda rights.

From the testimony at the voluntariness hearing the court could well have found that the defendant had voluntarily and intelligently waived his right to the presence of his appointed counsel. We hold that there is no magic formula of words nor pre-ordained ritual which must be invoked in order to accomplish this waiver, as long as there is a satisfactory showing that the defendant did so willingly and with an understanding of what he was doing.

The defendant at the hearing gave testimony from which the court could infer that his statements to the deputies were made under the pressure of his being placed in the "hole." The trial court's order leaves unclear whether or not its finding of involuntariness was based on the mandate of the Herman case, supra, or on the other facts presented at the hearing. It is for this reason we consider it appropriate for the trial court to re-examine this matter and make a specific finding as to whether the circumstances of taking the statements were so oppressive as to render such statements involuntary.

This case is remanded to the trial court for proceedings not inconsistent with this decision.

STRUCKMEYER, V. C. J., and UDALL, J., concur.

McFARLAND, Justice (dissenting).

This case comes before us on a writ of certiorari to determine whether there was substantial evidence to support the holding of Judge Morris Rozar that statements made by the defendant were not voluntarily made, and for this reason are inadmissible. In passing upon this question in past cases, we have held this Court is not concerned with mere conflicts in the evidence but whether there is substantial evidence to support a verdict or finding of the trial court. State v. Owen, 101 Ariz. 156, 416 P.2d 589; State v. Turner, 101 Ariz. 85, 416 P.2d 409; State v. Rivera, 94 Ariz. 45, 381 P.2d 584.

The defendant was arraigned in Tolleson Precinct Justice Court on the 9th day of January 1969, at which time the Public Defender was appointed to represent him in all future proceedings. Immediately prior to the trial, on November 6, 1969, a voluntariness hearing was held as to these alleged statements made by the defendant. At the hearing, Maricopa County Deputy Sheriffs Dave Arellanes, Jim Kepner, and Tom Ennis testified as to the statements allegedly made by the defendant.

The defendant and Oral W. Tucker, Jr., a deputy public defender, testified in opposition to the alleged voluntary statements. The officers testified that they had three separate conversations with the defendant—namely, on the 12th, 19th, and 20th

days of January 1969. They testified that during these conversations the defendant made certain incriminating statements. The question of the voluntariness of the statements turns upon whether the defendant waived his right to counsel. The officers testified that the defendant informed them that he was, in fact, represented by the public defender at the time. The officers testified that before each of the times of interrogations they read to defendant what are known as the "Miranda warnings" as follows:

> "You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning, and to be with you during questioning, if you so desire. If you cannot afford an attorney, you have a right to have an attorney appointed for you prior to questioning."

The cards with the warnings were introduced in evidence. The card of January 12th contains the signature of defendant, and those of the 19th and 20th show he had initialed the card, which indicates that he had had it read to him, or at least that he had seen it. After which the officers testified that the defendant made oral statements to the deputies concerning the alleged crimes. Defendant's counsel were not present prior to the conversation, or at any time during the conversations. The record does not show that defendant expressly waived his right to counsel at the time of the conversations. It merely shows that the deputies read the Miranda rights to him. Defendant's testimony at the hearing was as follows:

"DIRECT EXAMINATION

"BY MR. HURLEY:

"Q Would you state your name, please?

"A Terryl Scott Merritt

"Q Terryl, are you the defendant in this case?

"A Yes.

"Q Terryl, do you recall the date that you were arrested for this charge?

"A Yes.

"Q What date was that?

"A January 7.

"Q What year?

"A 1969.

"Q All right. Do you recall when you were arraigned on this charge in the J. P. Court?

"A January 9th, 1969.

"Q And what J. P. Court was this, do you recall?

"A It's in Tolleson, Arizona, and Justice Session was the justice.

"Q All right. Do you recall whether or not the Judge asked you if you had funds to employ a private counsel at that time?

"A Yes, he did.

"Q And what was your answer to that?

"A That I had no funds to obtain counsel.

"Q And what did he say in regards to that?

"A He asked me if I wanted counsel for my defense.

"Q And what did you say?

"A I told the court at that time that I wanted all my rights and that I did.

"Q And then what did he say?

"A And then he said he would notify the Public Defender's Office and an attorney would be appointed for my counsel.

"Q Now, you know Detective Arellanes and Sargeant Kepner, do you not?

"A Yes, I do.

"Q And they questioned you in this matter?

"A Yes, they did.

"Q At any time did you tell them that you were represented by the Public Defender's Office?

"A Yes, I did.

"Q And when did you tell them that? Do you recall?

"A Everytime that they came to see me.

"Q You told them that you were represented by the Public Defender's Office?

"A Yes, I did. I told them everytime that they came to see me.

"Q All right.

"A I said that I had a lawyer and it was all—I also told them that I had a lawyer when they were showing me off to the witnesses.

"MR. HURLEY: All right. No further questions.

"CROSS EXAMINATION

"BY MR. ECKERMAN:

"Q Did you, Terry, have a conversation with Officer Tom Ennis sometime after your arrest in jail?

"A Yes, I did. I put in a tank order to see him.

"Q And did he then come and see you?

"A Yes, he did.

"Q And did you at that time ask him to see the other officers in the case, the investigating officers?

"A Yes, I did. I wanted to talk. I wanted to ask them why I was in the hole and why I could not see a doctor because of the way my hands was treated when I was cuffed out in the desert. That's why I wanted to see them.

"Q And did they then come and see you?

"A Yes, they did. They would not talk. They would not talk.

"Q Just answer my questions.

"MR. HURLEY: Just answer his questions, Terry.

"A Yes, I understand.

"Q And at the time you saw them, were you warned of your rights by them, your constitutional rights?

"A After they talked to me first, and that's just what happened.

"Q Did they warn you of your rights prior to talking with them?

"A After I talked to them first.

"Q And did you request to see the officers also on later occasions?

"A Yes, sir, I did. I still wanted to know why I was in the hole, which I still have been for ten months.

"MR. ECKERMAN: Do you have those cards here?

"THE CLERK: Yes.

"Q BY MR. ECKERMAN: Now, the first time that you saw the officers, did you agree to go with them and show them where the items had been hidden that were taken from Mr. Satran's house?

"A I did not. I agreed to do this, they came up to talk to me, they came up to talk to me because of the tank order I put in to talk to them about why I was in the hole, they asked me first to help clear this up and to show them where the stuff was at.

"I told them I did not know where the stuff was at, but I said since I knew so much about the desert that I might, that I might could help them locate the stuff. That's all I said.

"So they asked me if I would go with them.

"Q All right.

"A And I agreed to go."

The trial court based its ruling upon State v. Herman, 3 Ariz.App. 323, 414 P.2d 172, which case follows the holdings of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. It will be noted that the defendant testified that he was represented by the Public Defender during all of this time. It will also be noted that he did not waive his right to have counsel present during interrogation. Also he admitted he had sent a request to see the officers, but testified that the reason he wanted to see them was that they had put him in the "hole," and that he wanted to find out why he could not see a doctor because of his hands. He further admitted in his testimony that he was warned of his rights, but said it was after he made his statement—that is, after they "talked to me first, and that's just what happened."

"Q Did they warn you of your rights prior to talking with them?

"A After I talked to them first."

He further admitted that he had requested to see the officers again at a later occasion for the same reasons. In Miranda, the Court stated:

"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the inter-rogation process. A once-stated warn-ing, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warn-ing given by the interrogators is not alone sufficient to acccomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more 'will benefit only the recidivist and the professional.' Brief for the National District Attorneys Association as *amicus curiae,* p. 14. Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret inter-rogation process. Cf. Escobedo v. Illinois, 378 U.S. 478, 485, n. 5, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977, 983. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.

\* \* \* \* \* \*

"An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures. his right to have one, his failure to ask for a lawyer does not constitute a waiver.

No effective waiver of the right to counsel during interrogation can be recognized unless specifically made *after* the warnings we here delineate have been given. \* \* \* [384 U.S. at 469, 470, 86 S.Ct. at 1625, 1626, 16 L.Ed.2d at 720, 721]

\* \* \* \* \* \*

"If the interrogation continues without the presence of an attorney and a state-ment is taken, *a heavy burden* rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrim-ination and his right to retained or ap-pointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 986. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, [146 A.L.R. 357] (1938), and we re-assert these stand-ards as applied to in-custody interroga-tion. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making avail-able corroborated evidence of warnings given during incommunicado interroga-tion, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. *But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.* A statement we made in Carnley v. Cochran. 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, 77 (1962), is applicable here:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evi-dence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer.

Anything less is not waiver.' [Id. 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed. at 724—Emphasis added.]

\* \* \* \* \* \*

" \* \* \* He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. *After* such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.*" [Id. 384 U.S. 479, 86 S.Ct. at 1630, 16 L.Ed. at 726—Emphasis added.]

Summing up the evidence before the court at the time, in the light most favorable to support the decision of the trial court, the defendant requested an attorney be appointed to represent him; that the Public Defender's Office was appointed to represent him; and that it was representing him at the time of the interrogations. Oral W. Tucker, Jr., Deputy Public Defender, testified that it was the policy of the Public Defender to send letters to the jail to the effect that that office is representing the defendant, and if an officer wants to talk to a defendant it should be cleared through the Public Defender; also that it is the policy of the Public Defender to be present during any conversation with an officer. Defendant testified that he sent for the officers with what they call "tank" orders for the purpose of finding out why he was in the "hole"—that is, in a "tank where they keep prisoners separated from any one else." Also why he could not see a doctor. "That is why I wanted to see them," he said.

He said the first question he asked them was "Why am I here in the hole?" Even if he did request to talk to the officers about the case there is nothing in the record that shows an affirmative waiver of his right to have his counsel present. Without this waiver, the testimony is not voluntary. In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, the defendant, after being indicted with other persons for violating the federal narcotics law, retained a lawyer, pleaded not guilty, and was released on bail. While on bail, defendant held a conversation in the absence of his counsel with one of his co-defendants while sitting in the latter's automobile, unaware that the other defendant—cooperating with government agents—had allowed the installation of a radio transmitter under the front seat of the automobile by means of which a federal agent listened to the conversation. The court rejected the statement of the defendant during the conversation, using the following language:

"Ever since this Court's decision in the Spano case [360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265], the New York courts have unequivocally followed this constitutional rule. 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' People v. Waterman, 9 N.Y.2d 561, 565, 216 N.Y.S.2d 70, 75, 175 N.E.2d 445, 448.

"This view no more than reflects a constitutional principle established as long ago as Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, [84 A.L.R. 527,] where the Court noted that ' \* \* \* during perhaps the most critical period of the proceedings \* \* \* that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important,

the defendants * * * [are] as much entitled to such aid [of counsel] during that period as at the trial itself.' Id. 287 U.S. at 57, 53 S.Ct., at 59, 77 L.Ed. 158. And since the Spano decision the same basic constitutional principle has been broadly reaffirmed by this Court. Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

"Here we deal not with a state court conviction, but with a federal case, where the specific guarantee of the Sixth Amendment directly applies. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, [146 A.L.R. 357]. We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the Spano case the defendant was interrogated in a police station while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, 'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon * * * because he did not even know that he was under interrogation by a government agent.' 307 F.2d [62] at 72–73."

The majority cite Reinke v. United States, 405 F.2d 228 (9th Cir.), as supporting its position. But, in the Reinke case there was a signed waiver of rights, which read as follows:

"'YOUR RIGHTS

"'Before we ask you any questions, you must understand your rights.

"'You have the right to remain silent.

"'Anything you say can be used against you in court.

"'You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"'If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"'If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"'A lawyer will also be provided for you now, if you wish, by the Federal Public Defender's Office, Phoenix, Arizona, whom you may call at 253–7907.

"'WAIVER OF RIGHTS

"'I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.'

"Signed WILLIAM G. REINKE, Jr."

It will be noted that the waiver was evidently patterned after the Miranda case. It followed the Miranda warnings. This signed waiver makes it clear that the Reinke case is not in point with the facts of the instant case. United States v. Dowells, 415 F.2d 801 (9th Cir.) followed the Reinke decision, but, like Reinke, involved clear evidence of an effective waiver—in fact, a signed waiver—made after the Miranda warnings were given. But, inherent in both Reinke and Dowells is the requirement, under Miranda, of proof of an express waiver, which is lacking here. The instant case is more analogous to Queen v. United States, 118 U.S.App.D.C. 262, 335 F.2d 297. The facts and holding follow:

"Appellant had been arrested March 14 and taken the next day before a United

States Commissioner. He admitted her to bail and continued the proceedings to allow her to obtain counsel, as she requested opportunity to do. On the continued date, March 28, she reappeared, as of course she was required to do, at the offices of the Commissioner, but without counsel. The police officer who had arrested her approached her in the witness room where she was awaiting appearance before the Commissioner. With two other officers he escorted her into another room, he says with her assent, to be questioned, alone with the officers. He also said he advised her of her right not to make a statement and that if she did so it might be used against her. He testified, however, that he knew she had asked for the continuance to obtain a lawyer, and he asked her if she had obtained counsel, to which she replied either that she had obtained a lawyer, was in the process of obtaining one, or was going to do so. He was not sure which of these answers she gave. He said he talked to her to try to get to the truth of the matters involved in the charge: 'I didn't feel that she had told me the truth on the 14th,' the date of the arrest, 'so I wanted to talk to her on this occasion to find out the whole truth if I could.'

"In the course of this secret interrogation, in the absence of counsel, and during the continuance granted for the very purpose of enabling counsel to be obtained, the self-incriminating statements were elicited. The result of this intervention by the officers was to frustrate the right of the accused to have the assistance of counsel until by reason of these extra-judicial proceedings such assistance would be rendered fruitless if the statements thus obtained could be used to convict. For this reason, and notwithstanding the absence of an indictment, the case clearly comes within the reasoning which led to the exclusion of the evidence in *Massiah* and *Escobedo*. And see Ricks v. United States, 118 U.S. App.D.C. 216, 334 F.2d 964.

"Reversed and remanded."

As was previously stated in Miranda, supra, " * * * a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." The trial court was of the opinion that the State failed to sustain this burden and there is substantial evidence to support this finding.

The mere fact of incarceration is not enough, in and of itself, to make every statement involuntary. I agree with the majority that continuous incarceration in the "hole" requires a close inquiry into the voluntariness of statements given under such conditions. But I cannot agree with the statement by the majority that the trial court's order is not clear as to the grounds upon which it was based. The fact that the trial court based its ruling on State v. Herman, supra, makes it plain that it did not consider incarceration in the "hole" as the critical factor, but was placing its decision squarely on the circumvention of defendant's counsel. The Herman case dealt solely with denial of the right to counsel, and not with coercion by virtue of incarceration. Therefore, remanding for a voluntariness hearing will not cure the problem.

Here there was an intentional interrogation of an "in custody" defendant with knowledge that he was represented by counsel; no attempt to contact said counsel; and no showing in the record of a clear and unequivocal waiver of the right to have counsel present. Such conduct violates the spirit, if not the letter, of the Miranda rule. Equally distressing is that the sanctioning of such conduct may severely undercut the future ability of defense attorneys to fulfill their obligation to vigorously protect the rights of their clients. It is my opinion that any defense attorney in private practice representing a defendant would deeply resent the representatives of the State talking to his client without the attorney's knowledge or consent. The Public De-

fender is entitled to the same consideration as privately-retained counsel.

For these reasons I must dissent.

LOCKWOOD, C. J., concurs in this dissent.