482 P.2d 863

. The STATE of Arizona, Appellee,

v.

Robert Benjamin SMITH, Appellant.

No. 1901.

Supreme Court of Arizona,
In Banc.

March 26, 1971.

Gary K. Nelson, Atty. Gen., by Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

Rod Wood, Phoenix, for appellant.

JACOBSON, Judge, Court of Appeals.

Defendant presently awaits execution on the sentence of death following his convictions of five counts of first degree murder and two counts of assault with intent to commit murder. He has appealed both the convictions and sentences.

That defendant committed the multiple murders and assaults with which he was charged, is not in dispute. On November 12, 1966, the defendant entered the Rose-Mar College of Beauty in Mesa, Arizona, whereupon he removed a gun from a paper bag he was carrying and fired a shot into the wall. At this point defendant ordered seven women in the college to enter a back room and lie down and then proceeded to shoot all seven women, killing five of them. The director of the college was unobserved by the defendant when he entered and after

hearing a shot and seeing the defendant with a gun ran next door and called the police. Two police officers arrived at the scene approximately two minutes after receiving the call, entered the college unarmed and were immediately confronted by the defendant who spontaneously advised them "I have shot some people back there. The gun is in there," (indicating the paper bag.) The defendant made no attempt to evade capture, was cooperative and no rational motive was shown for the killings—there was no evidence of robbery, extortion, sexual molestation or vandalism to the physical structure of the college. After being repeatedly advised of his rights he made a full written statement.

As indicated, there was no actual controversy raised by the defendant as to the commission of the physical acts necessary to charge him with the crimes alleged. The major portion of the trial was devoted to, and the only contested factual issue was, the sanity of the defendant at the time of the commission of the physical acts alleged.

The defendant raises several issues for review, the more substantive of which center around one general area, the sanity of the defendant both at the time of the commission of the crime and at the time of trial. Specifically, the defendant questions the admissibility of certain notes he authored and delivered to a fellow prisoner which were introduced by the state as rebuttal evidence bearing on the issue of defendant's sanity.

Turning first to the specific issue of the admissibility of those notes, it appears that at the time defendant was incarcerated in the Maricopa County Jail, awaiting trial, one Vernon Mahan occupied an adjoining cell to that of the defendant. In 1961, Mahan had been convicted of the robbery of the Arizona State Treasurer's office and sentenced to 20 to 30 years at the Arizona State Prison. *See* State v. Mahan, 92 Ariz. 271, 376 P.2d 132 (1962). While serving this sentence, Mahan was contacted by the then Chief Deputy County Attorney, Moise Berger, in order to induce Mahan to testify against his accomplice in the State Treasury robbery. In exchange for this testimony, Berger agreed to help Mahan obtain a parole.

Pursuant to this arrangement Mahan testified against his accomplice, but Berger's efforts to comply with his portion of the bargain before the Parole Board proved fruitless. Mahan had been brought to the Maricopa County jail prior to testifying against this accomplice, and was retained there after his testimony rather than being returned to the Arizona State Prison where possible retribution for his informant activities might follow.

Mahan testified in the Treasury robbery trial on November 4, 1966, and remained in Maricopa County jail until May 9, 1967. On February 1, 1967, the defendant was moved to a cell next to Mahan. Deputies in charge of the jail were aware that Mahan was an informer. The County Attorney's office through the cooperation of the Sheriff's office had the power to transfer prisoners within the jail itself. The jail holds between 350–400 men in 16 different cell blocks.

During the time that defendant and Mahan occupied adjoining cells, Mahan succeeded in gaining the defendant's confidence. As a result of this confidence, the defendant wrote fifteen to twenty notes to Mahan, four of which Mahan kept and turned over to the County Attorney's office, the rest being destroyed by Mahan. Two of these notes were admitted into evidence by the State on rebuttal, the contents of which are as follows:

EXHIBIT 88:

"Jack, I don't blame you for asking that question Jack, we've got to depend on each other.

I'm going to tell the truth, I'm not just lying in order to get out of here. Right after that shooting in Mesa I left my gun on the counter to go into the other other (sic) section of the building.

As I was walking over there 2 cops came right in the door behind me. They

were between me and my gun so they got me—& that's the truth—I've told a lot of people that I just gave up because I didn't want to fight—but that's just what I want them to believe—because I'm trying for that hospital. You can see how much I trust you, Jack—If the wrong people got hold of this note they would really hang me up.

O. K., Jack?"

EXHIBIT 89:

"The reason for my not writing out is that if a phycharist (sic) could get ahold of something that I'd written, he could tell them if I'm completely off my rocker or not. My attorney is making everyone on the outside think that I'm completely insane. Right now he's getting letters out for me—so I'm not worried."

These notes and their use in this trial by the prosecution were evidence, in the words of the trial judge, such that "* * * if the court had excluded the notes, the verdict would have been affected * * * I find it would have had a direct effect on the verdict."

The four notes were not presented to the County Attorney at one time. At the time the first of these notes was presented to Mr. Berger, Mahan was required to tear off a corner to enable him to identify it at the time of trial. He was likewise required to write on the back of a second note, delivered during a later visit by Mr. Berger, for the purpose of court identification.

At the time the notes were offered in evidence no objection was made relating to an agency relationship between Mahan and the County Attorney's office. However, following the trial, a motion for a new trial was made and at the hearing on this motion evidence for the first time was presented that Mahan had made statements to other inmates of the Maricopa County Jail that he had made a deal with the County Attorney's office concerning obtaining of the notes in question. Moreover, testimony was given at this hearing by another inmate of the Maricopa County Jail, to the effect that he had been approached by Berger in Mahan's company to obtain information from the defendant in return for the dismissal of certain criminal charges pending against him.

Mr. Berger's testimony concerning the acquisition of the notes in question was as follows:

"He [Mahan] said, to me he says, 'What kind of information do you want me to get for you?'

"He said, 'I can talk to him and I can get information from him if you will tell me what you need.'

"I told him, I said, 'I can't tell you to go get any information from this man, and I can't tell you to talk to him to get information or anything else.' I said, in fact, 'I can't tell you anything, what we need or what we are interested in getting as far as evidence on the man because if in any way you were to act as an agent for us, in other words, if we told you "we need this, go get it," and you did, in fact, you would be acting as an agent for us, you would really be in a sense, you would be a police officer, you would be our agent.'"

"Q. And the evidence would be inadmissible under Messiah? [sic]:

"A. And the evidence would be inadmissible, right * * *."

Also Mr. Berger made notes of his conversation with Mahan relating to the defendant's oral statements, in Mahan's presence. After obtaining the evidence from Mahan concerning the defendant, Mahan's robbery conviction (which had been affirmed on appeal) was reduced to grand theft and he was resentenced to time served and released.

Defense counsel at the time of the hearing on the motion for a new trial for the first time argued the inadmissibility of these notes on the grounds that Mahan was a planted agent of the State and therefore, under the doctrine of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed. 2d 246 (1964), evidence obtained by him was inadmissible.

Defense counsel had, prior to trial, filed a motion to suppress "any and all statements, oral or written, which the State contends were made by defendant on November 12, 1966, or thereafter." A two-day hearing was held on this motion and although the notes in question were then in the possession of the County Attorney's office the existence of the notes was not revealed to the defense, nor did the trial court have an opportunity to determine whether the defendant was entitled to inspect these notes.

On appeal defendant again argues the agency relationship of Mahan to the State and also raises the propriety of the State's failure to disclose existence of these notes to the defense prior to trial. In view of our determination as to the former contention, we need not decide the latter.

The basic rationale of *Massiah* is that "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." 377 U.S. at 205, 84 S.Ct. at 1202, *quoting* People v. Waterman, 9 N.Y.2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1961).

This succinct statement of constitutional principle has been adopted in Arizona by the case of State v. Gallagher, 97 Ariz. 1, 396 P.2d 241 (1964). Thus the question facing the court is whether the trial court correctly determined, on the evidence presented by the motion for new trial, that no agency relationship existed between Mahan and the County Attorney's office which would bring into play the *Massiah* doctrine.

 Under the facts in this case, we are forced to conclude that an agency relationship existed between Mahan and the County Attorney's office sufficient to render Mahan an investigative arm of that office.

The facts leading to this conclusion may be summarized as follows: Mahan was a known informer used by the County Attor-ney on a previous occasion, with the express understanding that in exchange for testimony, parole for Mahan would be obtained; out of 350–400 inmates in the Maricopa County Jail, the defendant was placed next to this known informer; the County Attorney's office had the power to control the placement of inmates; following the performance by Mahan of all the services required of him in connection with his prior activities, he was allowed to remain in the Maricopa County Jail for six months; the notes delivered to the County Attorney's office were specifically marked in such a manner as would require Mahan's testimony at the defendant's trial; and notes were made by Berger of defendant's oral conversations with Mahan, again indicating the necessity of Mahan's appearance at trial.

At this point it should be emphasized that law enforcement officials have the right, and indeed the obligation in the prosecution of crimes to use all information that comes into their hands pointing to the guilt of an accused. This is true even though the persons supplying that information may harbor expressed or unexpressed motives of expectation of lenient treatment in exchange for such information. It is only when the state actively enters into the picture to obtain the desired information in contravention of constitutionally protected rights that the sanction of inadmissibility becomes pertinent. It is not that the information is any less material or valuable to the finding of truth, it is the concept that the state's overriding of an individual's constitutionally-based rights will not be tolerated. In this arena of contesting interests, i. e., where probative evidence and individual rights become mutually exclusive, our courts have decreed that individual rights must prevail.

With this in mind we now turn to the damning fact that when all efforts on behalf of Mahan by the County Attorney's office before the Parole Board proved fruitless and that office had completely complied with all of its obligations to Mahan under its previous arrangements

with him, Mahan's conviction was set aside, without opposition from the County Attorney's office, and Mahan was allowed to plead to a lesser charge and was completely released upon resentence to time served, again without opposition from the County Attorney's office. In other words Mahan received his quid pro quo.

While we have no doubt that Mr. Berger's sworn testimony that he made no oral commitments to Mahan is technically correct, this court does not live in the never-never land of Peter Pan.

Given the following facts: In 1966, A supplies information to B pursuant to an agreement that in exchange for such information B will perform services for A; the information is supplied and the services are rendered; in 1967, A again supplies information to B and B again performs services for A, and in order to perform these services B bypasses the mandate of a court and the duly constituted Parole Board of this state. Are we to close our eyes to the logical conclusion that the 1967 services were *also* performed pursuant to an agreement, either spoken or unspoken? We do not. As the dissent in this matter correctly points out, weighing of the evidence and credibility of witnesses is properly for the trial court. However, the findings of the trial court must be supported by substantial evidence, leading to logical, reasonable conclusions.

In our opinion, the conclusion is inescapable in this case that Mahan expected some benefit to accrue from his assisting the state and in view of the past dealings of Mahan with the County Attorney based upon a favor done for a favor received, that the state intended to reciprocate for such assistance. We thus find Mahan's statement that he delivered the notes to Mr. Berger only because "it was the right thing to do" somewhat hollow. In reaching our conclusion herein, we are not unmindful that the evidence of the agency relationship between Mahan and the County Attorney's office was first presented to the trial court after six weeks of jury trial, a verdict of

guilty and a recommended sentence of death. As the trial court itself stated: "It is unfortunate that all of this could not have been presented to the trial court so it could have been resolved in the proper atmosphere."

 There is no doubt that neither the County Attorney's office nor law enforcement officers could have, after appointment of counsel, taken the notes in question directly from an involuntary defendant in such a manner as to make them admissible. State v. Herman, 3 Ariz.App. 323, 414 P.2d 172 (1966), overruled in other particulars in State ex rel. Berger v. Superior Court, 105 Ariz. 553, 468 P.2d 580 (1970). What the State may not do directly, it cannot do indirectly. As was stated in State v. Goff, 99 Ariz. 79, 407 P. 2d 55 (1965):

"It is an advantage obtained through trickery or affirmative conduct which tends to evade fundamental rights, thereby denying due process of law which is forbidden. [citing *Massiah*]. It is the unfair advantage obtained thereby which courts will not tolerate." 99 Ariz. at 83, 407 P.2d at 57.

We therefore hold the notes obtained by Mahan from the defendant under the circumstances of this case were inadmissible. Their admission being prejudicial error, this matter is reversed and remanded for a new trial.

We specifically do not pass upon defendant's contention that the evidence does not support the jury's verdict concerning the issue of insanity, this evidence being a proper matter for consideration upon retrial.

STRUCKMEYER, C. J., concurs.

*Note:* Justice LORNA E. LOCKWOOD having requested that she be relieved from consideration of this matter, Judge EINO M. JACOBSON, Court of Appeals, was called to sit in her stead and participate in the determination of this decision.

CAMERON, Justice (concurring).

I concur with the result reached by Judge Jacobson and Justice Struckmeyer but for different reasons. I agree with Justice Hays that the trial court was in a better position to observe the demeanor of both Mr. Berger, the Chief Deputy County Attorney, and Vernon Mahan, and to factually determine the issue of agency based upon their testimony. However, even were we to find direct agency to exist between the witness and the County Attorney, the notes might be admissible. The trend of the United States Supreme Court, both in denying certiorari in the case of Miller v. California, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968) and in the opinion of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), would indicate an enlargement of the permissible usage of illegally obtained but trustworthy evidence as well as a contraction of the rule laid down in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). I believe, however, that other grounds for reversal exist.

Prior to trial the attorney for the defendant moved the court "for an order directing and compelling the prosecution to furnish the defense with any and all information known by it to exist which is or may be favorable to or supporting the defense of insanity." This motion was granted and the statement in the minutes of the court indicates that the County Attorney and his Deputy were in agreement. The minutes read:

> "Statement by Moise Berger, Deputy County Attorney: 'We realize that this is not only a matter of motion granted by the Court, but we also realize that it is our duty as prosecutors to provide defendant any information on this question as a matter of ethics'."

The notes in question were in existence at the time this statement was made but were not made available to defendant's attorney until used by the prosecution on rebuttal. There were other notes that were never made available to defendant's attorney.

The testimony of the Chief Deputy County Attorney is as follows:

"Q How many notes in all did you see?

"A Four notes.

"Q How many notes did Mr. Mahan see?

"A I don't have any idea.

"Q Well, he said yesterday 15 to 20, did he not—or Saturday, I believe?

"A I believe he said something about like that. I don't recall.

"Q What happened to the other sixteen notes?

"A I don't know. They were not given to me.

"Q Were they given to any other law enforcement officers, as far as you know?

"A I don't know.

"Q Certainly if they were given to any member of the jail staff, they eventually would have found their way to your office and your file, true?

"A I don't know.

"Q What did any of the other notes say?

"A You mean of the four that were given to me or the other ten or fifteen?

"Q The other sixteen.

"A I don't know what the other notes said.

"Q Did you ask Mr. Mahan?

"A No, I don't remember doing it.

\* \* \* \* \* \*

"Q As these notes were obtained by Mr. Mahan, whether or not they were destroyed or kept for testimony was solely dependent upon Mr. Mahan's judgment?

"A Yes, true. It's hard to be, I don't know what notes he had.

"Q You had no idea at all what these notes said?

"A That is right."

It should be noted that whether the defendant actually committed the acts of

which he was accused was never questioned by the defense. The defendant's sanity was in question, however, and the testimony of Dr. Dupree on surrebuttal is enlightening in this regard:

> "Q Doctor, from a psychiatric standpoint, do these notes mean anything at all?
>
> * * * * * *
>
> "A Well, I think on the one hand, if I may, to pass notes to a fellow prisoner certainly shows poor judgment. This boy is on trial for his life.
>
> It also indicates that he—well, within the framework of judgment he is very unwise as who he picks to trust.
>
> The fear of psychiatry and psychiatrists is, I think, indicative of the boy's inability to trust me, particularly after I was selected by you to examine this boy. He has been told by you, by his parents, by me, I was appointed to examine him. I did examine him over 12 different times, over a period of months. I have no idea when these were actually written, but I had been in contact with this boy for quite some time, so I think it shows his inability to trust, and subsequently, aid in his own defense adequately. I think it shows extremely poor judgment, in view of the situation, total situation; the fact that he is on trial for his life."

The United States Supreme Court has stated:

> "[S]uppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, 218 (1963).

And this court has recognized that the prosecution has the obligation to disclose evidence favorable to the defendant whether he requests it or not. State v. Fowler, 101 Ariz. 561, 422 P.2d 125 (1967). Our court has stated:

> "It is now, though, an established proposition that disclosure of evidence favorable to an accused is not restricted to 'discovery' rights, and that there exists a broad duty on the part of the prosecution to reveal such evidence to the accused. * * *." State v. Maloney, 105 Ariz. 348, 351, 464 P.2d 793, 796 (1970). See also Sec. 2.1, Discovery and Procedure Before Trial, Minimum Standards for Criminal Justice of the American Bar Association.

Admittedly, where the question is the sanity of the defendant, what evidence is or is not favorable to the defendant is difficult to determine. The notes in this case may not have been on their face favorable to the defendant, but they were certainly material to the question of defendant's sanity. Were these four notes the only ones written, I might agree that it was harmless error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In this case, however, we have not only the failure of the prosecution to disclose the four notes prior to trial, but also the failure to properly preserve such other notes written by the defendant. Assuming that Mahan was not the County Attorney's agent and that he was completely on his own as the trial court has held, the prosecution nevertheless relied on the four notes he passed on to the State at the same time making little or no effort to learn of or to preserve the other notes which were being written by the defendant and which it may be suspected, were more favorable to the defendant than the ones introduced into evidence. It is also possible that the other notes explained some of the language in the four notes preserved. A District of Columbia case of Bryant v. United States, D.C.Cir., 439 F.2d 642, 1971, held that the prosecutor must make an "earnest effort" to preserve evidence in a criminal case. Where the question is the sanity of the defendant, any doubts should be resolved in favor of the disclosure, and the prosecution

should be required not only to make an earnest and good faith effort to preserve all the evidence relating to the defendant's sanity, particularly the defendant's own written statements, but, upon proper motion, make it available to the defendant's attorney prior to trial. It may not be reasonable to rely upon Dr. Dupree's testimony that the notes were favorable to the defense as to the question of the defendant's sanity, but the cumulative effect of the failure to disclose coupled with the failure to make an earnest effort to preserve the other notes makes the introduction into evidence of the four notes reversible error. See State v. Von Reeden, 9 Ariz.App. 190, 450 P.2d 702 (1969).

I concur that the matter should be reversed for a new trial.

HAYS, Vice Chief Justice (dissenting):

The majority seems to have abandoned its appropriate role as an appellate court in reviewing this case. The trial judge more than six months after the actual trial held a hearing on defendant Smith's motion for a new trial. At this time he heard an array of convict testimony which attacked the veracity of the state's witness, Mahan, and attempted to establish that Mahan had bragged about being an agent of the county attorney. There was no doubt that each witness had nothing but contempt for Mahan.

The trial judge's comment at the close of the hearing puts the matter in proper perspective:

"And it's not improbable at all considering the rather unsavory character of Mr. Mayhem (sic) that he was telling around down there that he had a deal with the County Attorney's office. I do not or cannot find any quarrel with that testimony. * * * I still cannot disregard the nature of this testimony coming from the mouths of the witnesses of this character, so to speak, in the face of Mr. Berger's flat denial which is completely unimpeached that he did not at any time make a deal with him, if any deal was made." RT p. 127.

\* \* \* \* \* \*

"We must deal here with it being a principle of law, that it's merely impeaching evidence and not sufficient for a motion for a new trial." RT p. 128.

Brushing aside the testimony of convicts or ex-convicts who were busily grinding personal axes, we have the unimpeached testimony of the then Deputy County Attorney Berger. The only way around Berger's testimony is to say that the circumstances reflect so strongly against that testimony that he is a perjurer and a liar. The trial judge who has the role of weighing the evidence chose not to do so. There is evidence to support the position of the trial judge, and it does not affirmatively appear that there has been an abuse of discretion. State v. Turner, 92 Ariz. 214, 375 P.2d 567 (1962).

In the absence of a finding that Mahan was an agent of the law enforcement officials the notes which are the center of the controversy here are admissible. The Ninth Circuit Court of Appeals disposed of this problem in Stowers v. United States, 351 F.2d 301 (1965) in the following language:

"Before there was an opportunity for consultation with counsel, appellant and Kirtley were placed in such proximity as to permit of conversation. There is no evidence that the two were so placed in furtherance of a Government plan or ruse or trick to obtain evidence of admissions on the part of either. No recording or transmittal device was concealed, as in the case of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), upon which appellant strongly relies." 351 F.2d at 302.

I have raised a question as to how truly the record reflects an agency relationship existing between Mahan and the County Attorney's Office; however, my objections also go to the basic issue of the supposed deprivation of constitutional rights. For

the purpose of the following comments I shall assume that the agency relationship did exist.

What has happened to the time honored goal of the courts, the ascertainment of truth? Why do the Marquis of Queensbury rules apply only to the state? The words of Justice White bring these questions into sharp focus in his dissent in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964):

> "It is therefore a rather portentious occasion when a constitutional rule is established barring the use of evidence which is relevant, reliable and highly probative of the issue which the trial court has before it—whether the accused committed the act with which he is charged * *. With all due deference, I am not at all convinced that the additional barriers to the pursuit of truth which the Court today erects rest on anything like the solid foundations which decisions of this gravity should require." 377 U.S. at p. 208, 84 S.Ct. at 1204.

I am well aware that citing dissents is often indicative of having forever lost the game, but some encouragement may be found in the fact that a majority of the United States Supreme Court in Miller v. State of California, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 dismissed the writ of certiorari as improvidently granted. Justice Marshall wrote a lengthy memorandum decision concurred in by Chief Justice Warren, Justice Douglas and Justice Brennan, which strongly dissented from the dismissal of the writ. The facts in that case bear a strong resemblance to the facts here.

In Miller, supra, an undercover agent employed by the Sheriff was placed in the same cell with the defendant who was charged with the murder of her husband. The defendant at this time had an attorney, who had in fact set up a watch on her cell to prevent communication with her by the law enforcement officials. The undercover agent was permitted at the trial to testify as to admissions made by the defendant.

I am also aware that there may be a variety of reasons why the majority of the court in Miller dismissed the writ of certiorari, but I must at least be permitted the hope that the United States Supreme Court may as it has in similar matters, recede from the doctrine of Massiah, supra.

I am not outraged by the facts of this case (as we originally stipulated they *might* be) nor am I upset by the actions of the sheriff in the *Miller* case. A system of justice which countenances the "dirty business" of informers in narcotics cases does violence to logic in its scurrying to align itself with none but the angels in this situation.

In this case there has never been any question as to the defendant's guilt. The sole issue for determination throughout the trial was whether the defendant was legally insane. Testimony as to defendant's actions and utterances while incarcerated have often been admitted to shed light on this issue, even those actions and utterances outside the presence of his attorney.

Furthermore, there has been no question but that the defendant wrote the two notes to Mahan, which were introduced into the case as Exhibits 88 and 89. They read as follows:

EXHIBIT 88:
"Jack, I don't blame you for asking that question Jack, we've got to depend on each other.

I'm going to tell the truth, I'm not just lying in order to get out of here. Right after that shooting in Mesa I left my gun on the counter to go into the other other section of the building.

As I was walking over there 2 cops came right in the door behind me—they were between me & my gun so they got me—& that's the truth—I've told a lot of people that I just gave up because I didn't want to fight—But that's just what I want them to believe—because I'm trying for that hospital. You can see how much I trust you Jack—If the

wrong people got hold of this note they could really hang me up.

O.K. Jack?

EXHIBIT 89:

The reason for my not writing out is that if a phycharist (sic) could get ahold of something that I'd written, he could tell them if I'm completely off my rocker or not. My attorney is making everyone on the outside think that I'm completely insane. Right now he's getting letters out for me so I'm not worried."

No one has denied that the defendant was the author of the two notes and that he passed them through the bars of his cell to Mahan. Under the instructions as to the law, given by the Court, the jury could surely conclude that the writer of the two notes had a sane and lucid mind.

I respectfully dissent.

UDALL, J., concurs.