NATURE OF THE CASE
SPAETH, J.,
— This case arises on defendant’s motion to suppress his oral statements to the police.
STATEMENT OF THE EVIDENCE
The testimony, which transcribed extends to over 800 pages, presents a rather complex factual situation, so that it will be helpful to summarize it in narrative form before making such particular findings of fact as are necessary to resolve conflicts in the testimony and to dispose of the issues presented by the motion to suppress.

Defendant’s Arrest

Defendant, who was 19 and lived with his parents, was arrested at his home at 2:40 p.m. on Thursday, January 23, 1969. At 3 p.m., he was taken first to the Fifteenth Police District Headquarters at Harbison Avenue and Levick Streets, where he was left in the police *209 wagon for about 15 minutes, and next to the Police Administration Budding at Eighth and Race Streets, where he was taken to the Homicide Division. The first entry-on the police chronology states that defendant arrived at the Police Administration Building at 4:25 p.m.

The Initial Interrogation of Defendant

The first person to question defendant at the Police Administration Building was Detective Sincavage, who saw defendant in the Homicide Division at 4:30 p.m. (which, it will be recalled, was five minutes after defendant’s arrival as noted on the Police Chronology). The detective took an intelligence summary from defendant on a standard form. Then, the detective testified, in response to defendant’s request to know why he was being held, he left the interrogation room, got the information, and returned to tell defendant that someone, using defendant’s name, had attempted “to pass a check that had been taken the previous night in a holdup homicide.” The detective testified that before he spoke to defendant further, he warned defendant of his constitutional rights to remain silent and to have counsel, reading the warnings from a standard form.
Defendant’s testimony was different. He said that after Detective Sincavage had taken the intelligence summary, Detective Scott left the room to find out why he was being held. Although defendant nowhere explicitly denied being warned of his constitutional rights, he did imply that he wasn’t warned, testifying that the detective who took the intelligence report took his “name, address, age, occupation, and I gave him that and he left,” and that thereupon Detective Scott came in, and “started interrogating me about some checks.”
According to Detective Sincavage, he was the one who conducted the interrogation, with no other detec *210 tive present. He testified that the interrogation extended from 4:45 p.m. to 5:35 p.m., and that defendant made an exculpatory statement. On crossexamination, Detective Sincavage admitted that although he made notes of his interrogation of defendant, he made no reference in those notes to defendant’s exculpatory statement.
This statement is the first of five statements made by defendant. Although disagreeing about the identity of the detective to whom the statement was made, defendant testified that he did make an exculpatory statement.

The First Lie Detector Test

According to the police chronology, defendant, after his first interrogation, was left alone from 5:35 p.m. until 6:30 p.m. Detective Scott testified that at 6:30 p.m. he entered the room where defendant was resting and interrogated defendant. When defendant denied any knowledge of the stolen check or of “the fact that a holdup and killing had occurred,” the detective suggested that defendant take a lie detector test, to which defendant agreed. Defendant testified that he said that he “wasn’t taking anything at that time” and only agreed to take the test after the detective told him, “ ‘Well, we’ll have to get you some kind of way.’ ”
Detective Scott testified that he left defendant alone until 6:55 p.m., when he returned with Detective Kinsey and took defendant to Room 07, where the lie detector equipment was. Defendant’s testimony is unclear regarding the time of this and most subsequent events, perhaps because defendant had no watch and had to estimate the time from 3 p.m., when he left his parents’ home with the arresting officers. However, defendant did testify that there was a brief period when he was left alone just before being taken to Room 07.
*211 At 7 p.m. defendant arrived at Room 07, where he was given a pre-test interview by Detective Cullen. Detective Cullen testified that the test itself, which he was in charge of administering, lasted from 7:15 p.m. until 9:10 p.m.
Detective Scott testified that Detective Cullen told him that the test showed “deceptions” and that he “better warn this defendant.” Thereupon, the detective testified, he warned defendant of his constitutional rights to remain silent and to have counsel,[1] and, with Detective Cullen, proceeded to interrogate defendant until 1:20 a.m. It was during this interrogation, about 9:30 p.m. and 10 p.m., that defendant made his second statement, telling Detectives Cullen and Scott that he had found a brief case with checks in it and had agreed with one Louis Riggins to try to cash three of the checks. He denied any “involvement in the actual holdup and shooting . . . any involvement in the homicide whatsoever other than finding the checks afterwards.”
Defendant testified that from 7:30 p.m., when the lie detector test began, during the subsequent interrogation, and until he was taken upstairs about 1:20 a.m., he was continuously hooked up to the lie detector equipment. This testimony was not contradicted. Defendant further testified that during the period from his arrest at 3 p.m., and during the lie detector test and subsequent interrogation, the police did not give him any food, which is consistent with the police chronology which notes that defendant was given food at 2 a.m.

*212
The Attempts by Defendant’s Father and Others to Find Defendant

Evidently shortly after defendant’s arrest, defendant’s father received a message at work to call his daughter, which he did at about 3 p.m. He was told that defendant’s girl friend had reported that the police had arrested defendant, but had not said why. Defendant’s father immediately called the Fifteenth Police District, explained to an officer that defendant had been arrested, and asked whether defendant was there. He was told that defendant was not. Defendant’s father then called the Second Police District (in the same building as the Fifteenth Police District), and was told that defendant was not there either. Defendant’s father excused himself from work, went home to get his car, and drove to the building housing the Second and Fifteenth Police Districts. He testified that he arrived there sometime between 4 p.m. and 5 p.m., and asked the police to check their records to determine whether defendant had been locked up. He was told that there was no record of defendant at either District. He returned home and began telephoning in an attempt to find defendant. He called the Police District at Eleventh and Winter Streets, and was told that defendant was not there and that he should call the Police Administration Building. He called the Police Administration Building, and “was transferred from one office to another, and each place they told me that he wasn’t there.” He testified that his call was transferred to two or three different locations, and that when he repeated the call, he “kept getting the same story.” Finally, he gave up, and except for discussing with his wife defendant’s puzzling absence, he did nothing further until, according to his recollection, sometime between 9 p.m. and 10 p.m., when Robert Manley, a field worker with the Human Relations Commission, called and told him *213 that defendant was at the Police Administration Building.[2]
Mr. Manley had worked with defendant in the neighborhood near defendant’s home, and had learned from defendant’s mother of defendant’s arrest. Between 6:45 p.m. and 7:30 p.m., he testified, he made 25 to 30 telephone calls to “Police Department personnel.” He called the arraignment court at the Police Administration Building, the Fifteenth Police District, and the district attorney’s office in City Hall, with no success. He failed to note, and did not remember, which sections or departments he spoke to in the Police Administration Budding. Later in the evening he attended a meeting also attended Dy a policewoman friend. He told her of his difficulty in locating defendant, and she “essentially repeated the same thing that I did without any success.” At 10:30 p.m. he learned from another community worker that others he had worked with were being questioned in the Homicide Division of the Police Administration Building about a robbery-murder. Based on that information, at 10:45 p.m. his policewoman friend called the Homicide Division and was told by Sergeant Funk that defendant was also being questioned. Her request to speak with defendant was denied, so Mr. Manley went to the Police Administration Building, arriving at 11:20 p.m.
At 11:30 p.m., Mr. Manley spoke briefly to Sergeant Funk:
“I asked [the sergeant] what was going on. I told him I was interested in the Frankford youths who were being interrogated. And at that time, 11:30, he told me *214 that Louis Riggins had tried to cash one of Benami’s checks with [defendant’s] identification, and that they the police, considered [defendant] the one.” When Mr. Manley asked to be allowed to speak to defendant, the sergeant replied, in substance, according to Mr. Manley:
“Why should you want to see him? I’ve talked to his parents, and they say it is all right for us to question him.”
Thereupon Mr. Manley called “a corps of volunteers who are available around the clock,” and was referred to Bernard L. Segal, Esq., whom he called and spoke to at 11:45 p.m. After giving Mr. Segal defendant’s parents’ telephone number, Mr. Manley waited in the Homicide Division until defendant’s father arrived, which, he testified, was at 1 a.m. Defendant’s father told him that indeed Sergeant Funk had called him. He said that the call had been at about 11:30 p.m., and that the sergeant had said in effect:
“Mr. Price this is Sgt. Funk of the P.A.B. [Police Administration Building]. We are questioning James. We are not finished with him. We have given him dinner,[3] and he is all right. We will call you when we are finished.”
Further, defendant’s father told Mr. Manley:
“ [¶] e had been worried about where James was and was relieved to find.out that James was at the P.A.B. He said that Funk had put him at ease and given him the impression that it wasn’t anything serious, and he had then given Funk permission to question his son.”
*215 Defendant’s father testified that when he arrived at the Police Administration Building, he asked the desk officer to see defendant, and in about 15 minutes a detective came downstairs and asked him why he wanted to see defendant. He replied, “I wanted to see my son because I was his father and he was my kid and he was there, and I wanted to know why he was there,” to which the detective “said something about it’s only a minor thing and that I didn’t — wasn’t important for me to see or converse with him.”
This discussion lasted approximately a half hour, during which time defendant’s father was escorted upstairs to a corridor near the elevator, where a second officer met him, and with the detective said that “it wouldn’t be any advantage for me to speak with my son because what he was involved in was only a small thing.” While defendant’s father “was insisting that I see my son, and they were trying to show me reasons why I shouldn’t speak to him,” Mr. Segal arrived.
According to defendant’s father, his conversations with the two officers at the Police Administration Building occurred starting at about 11 or 11:30 p.m.
Mr. Manley, however, testified from a contemporaneous memorandum adopted by the Commonwealth, as well as by defendant, as an exhibit, that Sergeant Funk had not called defendant’s father until 11:30 p.m., and Mr. Segal did not arrive until 1 a.m. It is evident, therefore, that defendant’s father’s recollection was in error, and that he arrived at the Police Administration Building at about 12 or a little after.

Defendant’s Counsel’s Attempts to See Defendant

After Mr. Segal had called defendant’s father to ascertain that his representation was wanted, he made several calls to the Police Administration Building, *216 the first at about midnight, in which he spoke with Sergeant Funk in an attempt to speak with defendant. Upon finally being told by Inspector Bridgeport that he would have to come to the Police Administration Building to speak with defendant, he immediately left his house at 12:40 a.m. and went to the Police Administration Building, arriving, as noted above, at 1 a.m. With respect to the calls preceding his arrival, Mr. Segal testified that he was never told that defendant was in the lie detector test room, but, to the contrary, “was led to believe that he was up in Room 104.”
After twice complaining to the desk sergeant that he was being improperly delayed in seeing his client, Mr. Segal was allowed to sign the building registry at 1:23 a.m. He was then taken upstairs to the Homicide Division, where he was not allowed to see defendant until 1:48 a.m.[4]
Sometime between arriving at the Police Administration Building and speaking to defendant, Mr. Segal was told that defendant had made a damaging statement. Mr. Segal delayed speaking to defendant for a minute or two while he arranged for defendant’s father to see defendant. When Mr. Segal saw defendant, defendant said that he had been in the lie detector test room until just before coming upstairs to talk *217 to Mr. Segal. Mr. Segal’s and defendant’s conversation lasted about 15 minutes.[5]
Shortly after Mr. Segal spoke to defendant, defendant’s father saw defendant briefly, after which defendant was left alone until 5:45 a.m., when he was taken to another room to identify Louis Riggins. At about 8 or 8:30 a.m. Mr. Segal left the Police Administration Building. His “last statement to the two detectives” was, “I forbid you to speak to my client in my absence,” to which the detectives replied, “Well, we can’t take instructions from a lawyer.” Mr. Segal further testified that at no time during the early morning, from the time he was finally allowed to see defendant, at 1:48 a.m., until he left, at about 8 or 8:30 a.m., did he observe anyone questioning defendant; the police chronology also shows no interrogation during this period.

Defendant’s Counsel’s Negotiations With the Police

At about 12 noon, Mr. Segal, who was at the Sixth Police District at Eleventh and Winter Streets in connection with another matter, received a call from Inspector Golden, who said that the police were waiting for him at the Police Administration Building, and asked how soon he would be there. Mr. Segal replied that the hearing in which he was engaged was “far from over” but that he would come to the Police Administration Building as quickly as he could. He arrived there at 2:30 p.m.
*218 Between the time that Mr. Segal had left the Police Administration Building at 8 or 8:30 a.m. and his return at 2:30 p.m., according to the Police Chronology, there was no interrogation of defendant or other investigative work. Defendant testified, however, that shortly after Mr. Segal had left, interrogation had resumed, and that it was during this period of interrogation, just before noon, that he made his third statement. This statement was that he had received the checks from a boy named “I.”
Immediately after arriving at the Police Administration Building at 2:30 p.m., Mr. Segal had a discussion with “a full panoply of police inspectors and higher ranking officials,” including the police commissioner and William J. Stevens, Jr., Esq., an assistant district attorney. It will be recalled that not long after Mr. Segal had first arrived at the Police Administration Building, at 1 a.m., he had been told that defendant had made a damaging statement. After talking to defendant, Mr. Segal had suggested to the police that “perhaps [defendant] might be able to impart some information to them as to where the checks were gotten from that might prove useful [in tracing the murder]” and that “we ought to have the District Attorney’s office involved ... so that whatever procedure we followed could be worked out with the agent of the District Attorney’s office.” It was evidently in response to this suggestion that Mr. Segal had been called to return to the Police Administration Building.
Mr. Segal suggested that defendant give a statement about the person he had received the checks from, on condition that the statement not be usable against defendant for any purpose.[6] In the course of making *219 this suggestion, Mr. Segal suggested that defendant be given a lie detector test “in my presence to verify the off the record statement.” The police commissioner rejected the suggestion, whereupon Mr. Segal said, “Well, then all bets are off”, and the police said “ [W] ere going to have a line-up now.”

The First Line-up and the Events Following its Failure

The line-up occurred at 4 p.m. Before the witnesses saw the line-up, Mr. Segal was asked to give his approval. He refused, making three suggestions to eliminate what he considered to be unfair aspects of the line-up, and before the witnesses were brought in these suggestions were implemented.[7] The witnesses failed to identify anyone in the line-up. Thereupon, the police commissioner said to Mr. Segal:
“Counselor, I know you have a duty to your client, but why don’t you go in and tell him to give us a statement? It will go a lot better for him.”
Mr. Segal replied that “it was entirely too serious a matter to be just, you know, bandied about this way ...” The police commissioner said, “You’re right”, and ordered “Everybody back.” He then repeated his statement that if defendant gave a statement, it would “go a lot better for him.” Mr. Segal replied:
“Commissioner, that’s an absolutely impossible suggestion. Under no situation am I going to let him make a statement at least as of now now that the line-up has failed.”
*220 Following the discussion with the police commissioner, Mr. Segal returned to the interrogation room where defendant was being held. As he opened the door, he testified, he saw a detective sitting with his back to the door, and heard him telling defendant, “And we can do more for you than your lawyer can if you get rid of him.” Mr. Segal described what ensued as follows:
“. . . I said to the detective, I said, what in the name of hell do you think you’re doing. Please get out.’
“The detective got up and walked out of the room.
“. . . I told Captain Goldberg ....
“. . . And I said, trying very hard to control myself because I considered it to be such a strange and unbelievable situation, I said, ‘Frank, not only are you people interfering with my right to represent a man, but you’re’, the words I used, ‘you’re screwing with the constitutional rights of the defendant in a very, very serious case, and what in the name of hell'do you people think you’re doing by trying a trick like that?’
“Q. What was his response?
“A. Captain Goldberg looked at me and he laughed. And I said, ‘I don’t know how in the name of hell you can laugh at a situation like this. It isn’t funny. I think it’s shameful, and I’m going to file further complaints about it later on.’
“He said to me, ‘Oh, don’t get upset about it, calm down.’ I then walked out.”
Mr. Segal spoke briefly with defendant, spoke with several detectives on duty about the case, called his office, and returned to Captain Goldberg’s office. There, he testified,
“I said [to the Captain], ‘Frank, if there is anything else that transpires other than the booking of Price’, and I kidded him — I said, ‘of course, unless you want *221 to release him and send him home with me now,’ I said, ‘You can reach me at home.’
“I then took out my business card. I said, ‘I have a new telephone number which is not listed,’ and I wrote it on the back of the card. I said, ‘I’ll be in my office for awhile, and if you don’t reach me there this is my new home phone number, to call me’, and I gave it to Capt. Goldberg, the card, and he said ‘Fine’. And I said, you know, ‘I’ll talk to you later if there is anything else about this case’.”
Mr. Segal then left, at about 5:30 or 5:45 p.m.

The Second Line-up and Second Lie-detector Test

Detective McGowen testified that at 5:30 p.m. defendant was given a meal and left alone until 6:55 p.m.,. when a second line-up was held. Mr. Segal was not present.[8] Because “it was felt that [defendant] should have an attorney,” Louis Jackson, Esq., a lawyer with the Defender Association, was called from the preliminary arraignment court on the first floor of the Police *222 Administration Building to represent defendant. On crossexamination, Detective McGowen testified that he did not recall that Mr. Jackson did anything to change the line-up, that both Mr. Jackson and The Hon. Thomas Marotta, Municipal Court judge, who was present as a witness, answered affirmatively when asked whether they regarded the line-up as fair, and that neither made any objections to the line-up or suggested any changes. The detective further testified that so far as he knew, neither the Judge nor Mr. Jackson spoke to defendant before the line-up, and neither was given any substantial background information regarding the case. Defendant testified that he was placed in the line-up without being asked whether he waived the presence of his attorney, and that afterwards he was not told the result of the line-up. Defendant was not identified in the second line-up.
After the second line-up, defendant was taken back to the interrogation room where he had been kept most of the time. Defendant testified that Detectives Scott and McGowen at once began an interrogation that continued for the next hour and a half or two hours. Detective McGowen testified to the contrary that defendant was left alone until 9 p.m., when he gave defendant some food; and Detective Scott testified that he had no contact with defendant after 11:45 that morning.
At 8:45 p.m., defendant was “slated” by telephone; defendant was not present when the call was made. At 9:10 p.m., according to Detective McGowen, defendant was taken to the men’s room and back to the interrogation room. At 9:43 p.m., the detective testified, he asked defendant whether he still was sticking to his third statement, i.e., about receiving the checks from a person named “I” and whether he would be willing to take a lie detector test regarding the state *223 ment. The detective further testified that defendant said that he was sticking to the statement and would be willing to take a lie detector test regarding it, whereupon he took defendant to Room 07.
In the meantime, at 9 p.m., Mr. Segal had received a telephone call from a detective who asked whether he represented Louis Riggins. Mr. Segal responded that he did not and, after being allowed to speak to Riggins briefly in order to tell him that he should tell the police he wanted a lawyer, Mr. Segal again spoke with the detective, telling him that because of the seriousness of the case the police should get Riggins a lawyer. During this conversation, the detective did not tell Mr. Segal that defendant had been “slated” at 8:45 p.m.
It is not contended by the Commonwealth that Mr. Segal, in the conversation with the detective just described., was told that defendant was to be given a he detector test. Mr. Stevens, however, in his testimony regarding his telephone conversation with Mr. Segal at about 7 p.m., or about two and three-quarter hours before Detective McGowen asked defendant to take the lie detector test, said that he “gathered that there was no objection to the defendant taking a he detector test confined to the mere issue of the T story of whether or not these facts were true without his [Mr. Segal’s] presence.”
Mr. Stevens did not, however, say on what he based this impression, only quoting his conversation with Mr. Segal to the extent of saying:
“. . . I still have a feeling that in the course of that telephone conversation prior to the second line-up the matter of the lie detector test came up, and I do believe I said, ‘Well, I don’t know whether were going to bother with it or not, we might,’ or words to that effect.”
He did not say what reply Mr. Segal made to this observation.
*224 It would seem that this conversation, occurring at 7 p.m., could not have concerned Detective McGowen’s suggestion that the lie detector test be limited to the “I” story, for the detective, as has been seen, did not make his suggestion until about 9:45 p.m. and there is nothing in the record to suggest that until then anyone else in the police department had thought of the possibility of such a limited lie detector test. Mr. Segal, moreover, was unequivocal and clear in his testimony. His testimony regarding his statement to the police commissioner has already been referred to, in which he said that he did suggest a lie detector test regarding defendant’s statement of where he got the checks, provided the statement would be off the record, and that when the police commissioner refused to receive an off-the-record statement, he replied, “Well, then all bets are off,” whereupon the first line-up was conducted. In addition, upon crossexamination by Mr. Stevens, the following occurred:
“Q. Mr. Segal, do you insist that you specifically laid a condition upon the giving of a lie detector test that you be present?
“A. I could not be clearer on anything that I have testified in this case, Mr. Stevens, the fact I said put him on the box because that was the expression the police constantly used—
“Q. Yes.
“A. —and I was responding in the vernacular, you know, put him on the box if that will make you feel better about it, and 111 be there, I want to be there.
“As a matter of fact, I have never seen yet to this day the police give a polygraph examination, and there was some academic interest in me. I participated in other polygraph examinations with other law enforcement authorities, but I have never even been in the room, as a matter of fact, in the basement of Room 104, *225 in the basement of the Police Administration Building, and I wouldn’t have passed up the opportunity.
“Q. Do you recall anything being said between you and me at the time when, I suggest to you, I talked to you on the telephone regarding the second lineup about a lie detector test?
“A. No, sir, I do not recall such a reference.
“Q. Between 5:30 o’clock p.m. and 10:00 o’clock p.m.—
“THE COURT: Friday.
“BY MR. STEVENS:
“Q. —Friday, when you were not in the Police Administration Building, do you recall any conversation between you and me to the effect of your saying, well, are you going to give him the lie detector test? and my saying I don’t know; if there is nothing else to do, maybe we will?
“A. No, sir, I don’t recall that conversation, but let me say this, Mr. Stevens: If in fact such a conversation had even taken place, under no conceivable circumstances if I had been with two broken legs would I have permitted any client of mine under any circumstances ever to go to a lie detector test without me being there because I considered the giving of the he detector test to be an inherently coercive action. And while it may be lawful for the police, if I represented a client and I have a right to be there I would insist upon it because I feel it’s the only protection, his only protection.
“Q. Well, Mr. Segal, you state that that is your opinion?
“A. My view which guides my action. I don’t offer that, you know, as law or evidence. It is what guides my thinking and did at that time and had been for several years because I had had some training in the *226 polygraph in the Army and was very well aware of the fact that it was — we were taught in the Army that the polygraph is frequently useful because it’s coercive regardless of the actual results.
“And knowing that after that Army experience and then thereafter going into defense work, I never saw anything to alter what I was taught in the Army and saw everything to the contrary that in fact it is a correct statement that I find, as a matter of fact, Mr. Stevens, that it is only in homicide cases with the use of the he detector test that we get an incredible number of statements where all other detectives in nonhomicide cases have an incredibly low number of statements they manage to get.
“Q. The question I’m trying to put to you, Mr. Segal, is despite whatever your views, your internal views, on the matter have been, you surely aren’t suggesting that the police would be bound by your views merely?
“A. No, sir, they are certainly not. I’m just saying what guides my thinking and action and did at the time of this case and had for some time before.”
When defendant arrived in Room 07, he was placed in a chair at a desk in the outer room. Sergeant Janifer, the examiner, explained the purpose of the test to defendant, including the statement, according to Detective McGowen, “Now you’re not going to beat the machine or anything like this. I want you to tell the truth. We’re going to find out if it is the truth when you take the test.”
Defendant then read and signed the waiver form, and Sergeant Janifer began to fill out the interview sheet with defendant’s name, date of birth, and other personal information. At that point, Detective McGowen testified, defendant, pointing to the inner room, where the test equipment was, told Sergeant *227 Janifer that he would “tell the whole story; I won’t sign anything, but I’ll tell you the whole truth.” Sergeant Janifer and defendant went into the inner room where, according to Sergeant Janifer, defendant told him the details of the robbery and admitted firing the shots that killed the victim. This was defendant’s fourth statement.
Detective McGowen testified that defendant was not told by him or Sergeant Janifer that any statement he made could be used as evidence against him, nor that a listening device allowed persons outside the inner room to hear the conversation between him and Sergeant Janifer. Defendant denied confessing to Sergeant Janifer, testifying that he merely told the sergeant that he had made up the statement about “I” giving him the checks, whereupon the sergeant called him a liar and, after a brief discussion with Detective McGowen, told him that they weren’t going to give him the test and returned him to the interrogation room upstairs.

Defendant’s Statement to His Father

After defendant’s confession in the lie detector test room, Detective McGowen and Sergeant Janifer took defendant upstairs where the sergeant introduced himself to defendant’s father and told him that defendant had something to tell him. According to both Detective McGowen and Sergeant Janifer, defendant then stated to his father, “Pop, I shot him” and then to them that he would talk to the other defendants and tell them to tell the truth. This was defendant’s fifth statement.
Defendant’s father testified that defendant never calls him “Pop” and that when he asked defendant whether he had committed the crime, defendant replied, “No, Dad, I did not commit a crime. I’m just *228 hungry and I’m tired, and I’m sleepy.” Defendant’s father further testified that he then requested to make a telephone call, and that Sergeant Janifer took him outside the interrogation room and left him alone for 10 to 15 minutes, during which time he observed through the open door of the interrogation room that two boys were brought into the room. Defendant’s father telephoned Mr. Segal and told him that according to a detective, defendant had confessed a short time earlier. He returned to the interrogation room and told defendant not to say anything unless Mr. Segal was there; asked defendant if he had signed anything like a confession, to which defendant answered negatively; asked defendant whether he had eaten, to which defendant replied that he had only eaten a hamburger and coffee the day before; went with Sergeant Janifer and got food for defendant, which defendant ate; and left the Police Administration Building, after being told that defendant was going to be taken before a judge and then to the House of Correction at Holmesburg. He further testified that he was not informed that defendant had been charged with murder and robbery.
At 11:40 p.m. defendant was taken to a cell room in the basement of the Police Administration Building, preparatory to his preliminary arraignment. This was 33 hours after defendant’s arrest, and 24 hours after Mr. Manley had been told by Sergeant Funk that the police considered defendant “the one.”
FINDINGS OF FACT[9]
1. With respect to whether defendant was warned of his constitutional rights to remain silent and to *229 have counsel, the court finds: that on January 23, 1969, at about 4:30 p.m., shortly after defendant arrived at the Police Administration Building, Detective Sincavage warned defendant of his constitutional rights; that at about 9:10 p.m., when Detective Cullen decided that the he detector test he had just completed administering to defendant showed deceptions, Detective Scott warned defendant of his constitutional rights; and that at about 9:45 p.m., the next day, while Detective McGowen and Sergeant Janifer were preparing to administer a second he detector test, defendant was not warned of his constitutional rights.
This finding is substantially in accordance with the Commonwealth’s evidence. The court does not believe defendant’s testimony as to the identity of the officers who questioned him, nor his testimony that he was never warned of his constitutional rights. Defendant’s manner of testifying on these matters was evasive, while the testimony of each officer was generally inherently consistent and was corroborated by the testimony of other officers.
2. With respect to the statements that defendant made, the court finds: that between January 23rd, at about 4:30 p.m., and January 24th, at about 10 p.m., defendant made five statements: On January 23rd, between about 4:45 p.m. and 5:35 p.m., he told Detective Sincavage that he had had nothing to do with the robbery and homicide; between about 9:30 p.m. and 10 p.m., he told Detectives Cullen and Scott that he had found a brief case with checks in it and had agreed with one Louis Riggins to try to cash three of the checks; on January 24th (at a time that the court is unable to determine), defendant told an officer or officers (whose identity the court is unable to determine) that he had received the checks from a boy named “I”; about 9:45 p.m. defendant admitted to *230 Sergeant Janifer (the admission being overheard by Detective McGowen) that he had been involved in the robbery and homicide; and shortly after this admission, he told his father that he “shot him.”
In making this finding, the court has rejected as incredible the testimony of defendant that he never admitted to being involved in the robbery and homicide. Defendant’s interest in giving such testimony is so plain that the testimony must be scrutinized with particular care; and it does not appear where the officers would have learned what they testified defendant said except from defendant. The court accepts defendant’s testimony that he gave the statement regarding “I.” This testimony was against his interest, and is consistent with and corroborated by the subsequent attempt by the police to administer a lie detector test regarding the statement. Defendant testified that the “I” statement was given about noon to Detective Scott; the court, however, has no confidence either in defendant’s estimation of time or in his identification of the various officers to whom he spoke. With respect to defendant’s statement to his father, it should be observed that defendant’s father did not specifically deny that this statement was made as described by Detective McGowen and Sergeant Janifer; rather, he testified that after the police told him that defendant-had confessed, he said “Well, I didn’t hear [the confession]. May I ask him?”; that he asked defendant “Son, did you do this thing?”; and that defendant replied, “No, Dad, I did not commit a crime. I’m just hungry and I’m tired and I’m sleepy.” The court finds no inconsistency between the officers’ testimony and the father’s; it is not implausible that defendant did confess in his father’s presence, but when he realized that his father had not heard the confession, instead of repeating it, he said what the father testified he did.
*231 3. None of the foregoing five statements made by defendant was made in the presence of counsel.
4. From the time of defendant’s arrest, on January 23rd at 3 p.m., until January 24th at 1:48 a.m., the police deliberately excluded defendant from his family and counsel, holding defendant incommunicado until they had completed a lie detector test, between about 7 p.m. and 9:10 p.m., and an ensuing interrogation, extending until about 1:20 a.m. This exclusion was accomplished by: not telling defendant, when arresting him, of what he was suspected; not telling defendant’s father, in response to any of the father’s telephone calls, where defendant was; misrepresenting to defendant’s father that the matter was a minor one; when, because of Mr. Manley’s efforts, defendant’s father did learn whére defendant was and came to the Police Administration Building, refusing to permit defendant’s father to see defendant, and attempting to persuade him that it was not important for him to see defendant; refusing to permit defendant’s counsel, Mr. Segal, to speak to defendant on the telephone, instead requiring Mr. Segal to come to the Police Administration Building; refusing to permit Mr. Segal, upon his arrival at the Police Administration Building at 1 a.m., to see defendant until 1:48 a.m.
The basis for this finding is the testimony by defendant’s father, Mr. Manley, and Mr. Segal, which has been summarized in the preceding statement of the evidence. The testimony was substantially uncontradicted; it was inherently consistent; and the testimony of each of the three witnesses was consistent with and corroborated by the testimony of the other witnesses (although, as noted in the statement of the evidence, defendant’s father was in error in his recollection of certain times). In connection with these findings, it will be observed that of the five statements *232 given by defendant, and described in finding of fact no. 2, the first two were given during the period during which defendant was held incommunicado.
5. From 1:48 a.m., when the police permitted Mr. Segal to see and confer with defendant, through the first line-up, at 4 p.m., the police recognized and cooperated with Mr. Segal as counsel for defendant.
In particular support of this finding is the testimony, summarized in the preceding statement of the evidence and uncontradicted, that before conducting the line-up: the police telephoned Mr. Segal, who was involved in an unrelated hearing outside the Police Administration Building, and awaited his arrival at the Police Administration Building; they considered, although rejecting, Mr. Segal’s proposal that defendant be permitted to make an off-the-record statement, subject to verification by a lie detector test regarding where he had gotten the checks; and they responded to Mr. Segal’s objections to the proposed line-up by adopting his suggestions regarding the dress, age and complexion of the persons in the line-up.
According to defendant, in one respect the police did not cooperate with Mr. Segal: defendant testified that about noon, which was when Mr. Segal was at the hearing outside the Police Administration Building, an officer (whom he identified as Detective Scott) interrogated him and obtained the statement about “I.” As observed incident to finding of fact no. 2, however, the court has no confidence in defendant’s estimation of time, and it seems probable that this interrogation occurred sometime between about 5:30 p.m., when Mr. Segal had left the Police Administration Building, and 9:43 p.m. when Detective McGowen asked defendant if he was still sticking to his statement about “I” and whether he would take a he detector test regarding the statement.
*233 6. Upon the rejection by the police of the suggestion that defendant be permitted to make an off-the-record statement, subject to verification by a he detector test, regarding where he had gotten the checks, and after the failure of the line-up to result in an identification, Mr. Segal made it plain to the police that he was not going to permit defendant to make any statement.
With respect to this finding, the court accepts Mr. Segal’s testimony, summarized and partly quoted in the preceding statement of evidence, that he stated to the police commissioner that “ah bets are off,” and that when the police commissioner suggested that Mr. Segal should tell defendant to make a statement because “ [i] t will go better for him,” Mr. Segal replied that “ [u] nder no situation am I going to let him make a statement at least as of now now that the line-up has failed.” Not only was no witness called in contradiction of this testimony, but it was given in a manner that impressed the court as credible, and it described conduct in which one would expect counsel to engage under the circumstances.
7. Upon Mr. Segal’s refusal to permit defendant to make a statement, the police endeavored to persuade defendant to “get rid of’ Mr. Segal, assuring defendant that if he did, they “can do more for him.” By chance, Mr. Segal interrupted, whereupon he protested to Captain Goldberg, who told him that he should not “get upset about it, [but should] calm down.”
With respect to this finding, the court accepts Mr. Segal’s testimony, which was uncontradicted.
8. Before leaving the Police Administration Building, about 5:30 p.m., Mr. Segal told Captain Goldberg where he could be reached “if there is anything else that transpires other than the booking [of defendant],” giving the captain his business and unlisted *234 home telephone numbers, to which the captain replied, “Fine.”
With respect to this finding, the court accepts Mr. Segal’s testimony, which was uncontradicted.
9. About 7 p.m., a second line-up was conducted. Before it was conducted, William J. Stevens, Jr., Esq., the assistant district attorney assigned to assist the police in their investigation, telephoned Mr. Segal and indicated that the line-up would or might be conducted, and Mr. Segal did not object. In this conversation, Mr. Stevens did not obtain Mr. Segal’s consent to a lie detector test being administered to defendant in his absence, and Mr. Segal never gave such a consent nor modified his earlier refusal, which was communicated to the police commissioner and has been described in finding of fact no. 6, to permit defendant to make a statement.
With respect to this finding: the court accepts Mr. Stevens’s recollection, not disputed by Mr. Segal, that he told Mr. Segal about the line-up; the court further accepts Mr. Segal’s testimony, much of which has been quoted in the preceding statement of the evidence, that he did not agree, and that in no circumstances, for the reasons that he described, would he have agreed, to the lie detector test. Mr. Stevens’s testimony on this point is too general and inconclusive to offset Mr. Segal’s. The court accepts Mr. Stevens’s testimony that he was under the impression that Mr. Segal would not object to the lie detector test being administered in his absence, so long as the test was confined to the “I” statement. However, the court believes that this impression was derived from an incomplete knowledge of the conversations between Mr. Segal and the police commissioner and Captain Goldberg, which have been described in findings of fact nos. 6, 7, and 8.
*235 10. After the second line-up defendant was interrogated for about an hour and a half. When the interrogation produced no further statement, Detective McGowen, at 9:43 p.m., asked defendant whether he still was sticking to his statement about “I” and whether he would be willing to take a lie detector test regarding the statement. Defendant replied that he would. However, when informed by Sergeant Janifer, the examiner, that he could not “beat the machine,” defendant admitted to the sergeant being involved in the robbery and homicide, the admission being made in the room where the he detector test equipment was, and being overheard by Detective McGowen.
With respect to this finding, as indicated above incident to findings of fact nos. 1 and 2, the court has accepted the testimony of the sergeant and detective, and has rejected defendant’s.
11. Shortly after making the foregoing admission, defendant told his father that he had “shot him.” When the father indicated that he had not heard, and asked defendant whether he had committed the crime, defendant replied, “I did not commit a crime.”
The testimony in support of this finding has been discussed incident to finding of fact no. 2, where the five statements that defendant made to the police are identified.
12. At 11:30 p.m., January 24th 33 hours after defendant’s arrest, and 24 hours after Sergeant Funk told Mr. Manley that the police considered defendant “the one,” defendant was taken to a cell room in the Police Administration Building preparatory to his prehminary arraignment.
DISCUSSION
1. Definition of the issue.
Since it has been determined that defendant was warned of his constitutional rights to remain silent *236 and to have counsel, but nevertheless made statements to the police in the absence of counsel, the issue is whether defendant knowingly and intelligently waived his rights to remain silent and to have counsel.
When it is assserted that a defendant has waived these rights, the burden of proof is on the Commonwealth, and the “‘courts indulge every reasonable presumption against waiver’ ” of fundamental constitutional rights and “ ‘do not presume acquiescence in the loss of fundamental rights’ Johnson v. Zerbst, 304 U. S. 458, 464 (1938). And in Miranda v. Arizona, 384 U. S. 436, 475 (1966), the court reasserted the “high standards” required for proof of waiver of constitutional rights in an in-custody interrogation situation. Accord: Commonwealth v. Goldsmith, 438 Pa. 83, 85, 263 A.2d 322, 323-24 (1970).
The cases involving assertions of waiver present a variety of factual situations. In some of these it appears, as in the present case, that the defendant was represented by counsel. Cases from some jurisdictions arguably hold that when the defendant is represented by counsel, no waiver may be found unless the waiver was in the presence of counsel. There appears to be no Pennsylvania case that either adopts or refuses to adopt this view. Accordingly, it will be necessary first to examine the cases from other jurisdictions, and then, with such help as may have been gained from this examination, to determine what is the law of Pennsylvania.
2. The cases from other jurisdictions.
The New York rule pertaining to the rights of suspects during in-custody interrogation seems to have been the most protective of all jurisdictions, at least until recently.
In People v. Gunner, 15 N.Y. 2d 226, 257, N.Y.S. 2d 924, 205 N. E. 2d 852 (1965), defendant, suspected *237 of homicide, flew from New York to Los Angeles on the evening of July 16th, the day of the homicide. The Nassau County Police, on learning of defendant’s whereabouts, requested the Los Angeles police to apprehend defendant, which they did on July 18th. On July 19th, an attorney retained by defendant’s parents telephoned the Chief of the Nassau County Police and told him that he represented defendant, that he knew that defendant was in police custody in Los Angeles, and that he did not want any statements taken from defendant. From the time defendant was apprehended in Los Angeles until he was returned to Nassau County, he made 10 damaging oral or written statements. Before his attorney called the Chief of the Nassau County Police, he had given three statements (one at the motel in Los Angeles where he was apprehended, and two at a Los Angeles Police station), and after his attorney called, he made seven statements (two while in custody in Los Angeles; two during the flight back to New York, one of which was to a stewardess, apparently volunteered; and three in Nassau County prior to his arraignment but after his attorney had requested and been denied permission to speak to him). The lower court suppressed the statements to the extent that they were given after defendant’s attorney had notified the police of his representation of defendant, with the exception of the statement volunteered to the stewardess. On the basis of the rule announced in People v. Donovan, 13 N.Y. 2d 148, 243 N. Y. S. 2d 841, 193 N.E. 2d 628 (1963), the purpose of which was “to prohibit the police from questioning a suspect, in the absence of counsel, after an attorney has been retained to represent him and has apprised the police of his retention” (People v. Gunner, supra at 855, 257 N.Y.S. 2d at 928, 205 N.E. 2d at 855), the court *238 of appeals affirmed, Judge Fuld, who wrote the majority opinion, noting that he and the Chief Judge would have suppressed even the statements given to the police before the defendant’s attorney notified the police.
In People v. Arthur, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968), defendant was arrested near where he allegedly threw his two-year-old son off a bridge into a river at approximately 5:30 p.m. The child was rescued and not seriously injured. Defendant, immediately upon being apprehended, admitted having thrown his son into the river and was taken to a police station, where he was questioned. At 6:30 p.m., an officer began typing a statement that was completed at 6:45 p.m. In the meantime, an attorney who had represented defendant in the past saw a 6 p.m. TV report of the incident. The attorney went to the police station where defendant was being questioned, arriving at 6:15 or 6:20 p.m., and told a detective involved in the case that he represented defendant and wanted to speak to him immediately. The detective left to discuss the request with other officers, and returned to tell the attorney that he could see defendant after they had finished the questioning that was almost over. When defendant’s statement had been completed, at 6:45 p.m., the attorney was allowed to speak with defendant. As defendant appeared to be drunk and could not answer questions coherently, the attorney advised one of the police officers assigned to the investigation that because defendant was pretty sick, the police should leave him alone and there was no sense in talking to him anymore. The attorney then left the station. The next morning, defendant was questioned again, in the absence of the attorney, and made incriminating statements. The court of appeals reversed the *239 lower court and suppressed both the written statement and the oral statement, saying:
“ [O] nee the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant, the accused’s right to counsel attaches; and this right is not dependent upon the existence of a formal retainer. . . . Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel [citations omitted]. There is no requirement that the attorney or the defendant request the police to respect this right of the defendant”: People v. Arthur, supra at 539, 292 N.Y.S.2d at 666, 239 N.E.2d at 539.
Recently, however, the court of appeals appears to have withdrawn from this statement of the New York rule. In People v. Robles, 27 N.Y. 2d 155, 314 N.Y.S.2d 793, 263 N.E.2d 304 (1970), defendant was questioned but without effect before being taken to the police station, where he was placed in a “detention pen” and not questioned. When defendant’s attorney came to the station, defendant was brought to a clerical office where he and his attorney conferred alone for about 20 minutes. At the end of the conference, the attorney asked a detective, outside the room, if he would “watch” defendant. The detective entered the room and sat down at a desk across from defendant; the attorney apparently left defendant and the detective alone. A second detective éntered the room and gave defendant coffee and a sandwich, which the defendant did not appear to want. After asking about defendant’s refusal to eat, the first detective asked defendant if he ever thought that it *240 would end up this way. Defendant replied, according to the detective’s testimony, that he thought it would, that from what he had read in the newspapers, “he thought someday he would be arrested for killing those two girls.” The detective commented that defendant had made a mess of his life and concluded by asking defendant “just what really happened.” Defendant’s response was that he didn’t understand it, that he had gone “to pull a lousy burglary and . . . wound up killing two girls.” Defendant then recounted the details of the crime in a completely inculpatory statement, during which the detective from time to time interjected statements like, “Then what happened, Ricky?” In addition to the narrative to the detective and two other officers who entered the room, defendant made incriminating admissions later that same evening to other officers while defendant’s attorney was in the same room only 18 feet away. In seeking suppression of the statements, defendant relied on People v. Arthur, supra, and Judge Brietel, in a dissenting opinion, concurred in by Judge Fuld, in a separate dissenting opinion, would have suppressed the statements. A majority of the court, however, refused to accept defendant’s argument, stating that the rule of People v. Arthur, supra, “that once an attorney appears there can be no effective waiver unless made ‘in the presence of the attorney’ is merely a theoretical statement of the rule. This dogmatic claim is not the New York law”: [Citations omitted]: People v. Robles, supra, at 158, 314 N.Y.S.2d at 795, 263 N.E.2d at 305.
The majority went on to say that an ad hoc approach should be used, and seems to limit the rule of People v. Arthur, supra, to those cases where there is “evidence of conduct . . . which would indicate an intention to victimize a defendant or outwit his *241 attorney in order to carry on an inquiry”: People v. Robles, supra at 159, 314 N.Y.S.2d at 795, 263 N.E.2d at 305.
The majority distinguished the case before it from People v. Arthur, supra, on several grounds: that defendant’s initial statement was an “impetuous unbosoming” and not the product of the inquisitorial process; that defendant was not questioned at the police station at all prior to the arrival of his attorney, whereas Arthur’s attorney was delayed for almost a half hour while the police finished taking a formal statement from Arthur; and, “most significantly,” that defendant’s own attorney put the police in a position to hear defendant’s damaging admissions and “at all relevant times, this attorney was physically present and available to him, to advise him or otherwise assist” (People v. Robles, at 159, 314 N.Y.S.2d at 796, 263 N.E.2d at 306) whereas Arthur’s attorney instructed the police not to question Arthur, and was absent from the station when the police elicited Arthur’s second statement. Finally, the majority pointed out that “in no prior case where the defendant’s attorney was physically present in the immediate vicinity of his client and had had prompt access to his client have we held that admissions made by a defendant during such time are inadmissible”: People v. Robles, supra, at 160, 314 N.Y.S.2d at 796, 263 N.E.2d at 306.
Until recently, Arizona had a rule similar to the rule of People v. Arthur, supra, but in a recent decision the Supreme Court of Arizona has modified the rule much as People v. Robles, supra, modified People v. Arthur. In State ex rel. Berger v. Superior Court, 105 Ariz. 553, 468 P. 2d 580 (1970), defendant had appeared before a justice of the peace, apparently for a preliminary arraignment, had been incarcerated *242 and had had counsel appointed for him. Then defendant sent requests from the jail indicating that he wished to discuss his case. This resulted in three conversations with several deputy sheriffs. On each occasion, defendant made incriminating oral statements, to which the deputies testified at a pre-trial hearing. Defendant’s attorney was neither present nor called before any of the conversations with the deputies, although the deputies knew of the attorney’s representation of defendant. The lower court found the statements involuntary. The Supreme Court, however, remanded, stating that if the finding of involuntariness was based on a finding that defendant had confessed as a result of coercive pressure he felt from being placed in what was apparently an isolation cell, the lower court must articulate that finding, and if the finding was merely because the statement had been taken outside the presence of counsel, it would be set aside. In arriving at this decision, the court noted that in State v. Herman, 3 Ariz. App. 323, 414 P. 2d 172 (1966), the Arizona Superior Court had set forth the rule that “where a defendant has retained counsel from the time of his arraignment, the defendant may not be questioned outside the presence of counsel without counsel’s permission”: State ex rel. Berger v. Superior Court, supra at 554, 468 P. 2d at 581.
In referring to this rule, however, the court said:
“The decision concludes that statements elicited from a defendant, without the presence or approval of defendant’s counsel, are inadmissible as a matter of law. By our holding today we expressly overrule that portion of State v. Herman which is inconsistent herewith”: State ex rel. Berger v. Superior Court, supra at 554, 468 P. 2d at 581.
Two justices dissented, relying on the “heavy bur *243 den” that rests on the government to show a waiver of rights, as set forth in Miranda v. Arizona, 384 U.S. 436, 475 (1966).
It will be noted that the Arizona Superior Court rule, before it was limited by the Arizona Supreme Court, applied only from the time of defendant’s arraignment, and thus did not go so far as the rule of People v. Arthur, supra. Nor has this court found any jurisdiction adopting the rule of People v. Arthur, supra.
In Missouri, the Arizona Superior Court rule has been quoted with approval, the court, however, adopting an ad hoc approach comparable to that adopted in People v. Robles, supra. In State v. Witt, - Mo. -, 422 S.W.2d 304 (1967), the court, referring to the decision of the Arizona Superior Court in State v. Herman, supra, stated its rule as follows:
“. . . the statements (and fruits thereof) obtained from the defendant after arrest and arraignment before the Justice of the Peace and while he was represented by counsel are inadmissible because said statements were obtained outside the presence of defendant’s attorney”: State v. Witt, -Mo.-,-, 422 S.W.2d at 309.
Some of defendant’s statements were made before he had been arrested or formally charged and before counsel was appointed. Thus, they fell outside this rule. However, defendant also made statements after he appeared in magistrate court with his attorney to set a date for the prehminary hearing. Between the day defendant and his attorney met with the prosecuting attorney and the magistrate to set a date for the preliminary hearing, and the day of the preliminary hearing, the prosecuting attorney, along with the sheriff and a State highway patrolman, and *244 without notifying defendant’s attorney, questioned defendant and got him to repeat incriminating statements that defendant had made before he was arrested or formally charged. It is clear from the opinion that the court believed that the prosecuting attorney was employing deceptive tactics, and it expressly stated that its decision to suppress defendant’s statement was based on “this particular record.” Thus, the Missouri rule, like the New York rule as modified by People v. Robles, supra, would seem to be applicable only in situations of deliberate official interference with the fifth and sixth amendment rights of criminal suspects.
Some States have refused to adopt any rule other than an ad hoc approach that in each case involves a determination of whether a defendant knowingly and intelligently waived his right to counsel.
In State v. Adams, 76 Wash. 2d 650, at 670-71, 458 P. 2d 558 at page 571 (1969), the court expressly refused to apply the New York rule as stated in People v. Vella, 21 N.Y. 2d 249, 287 N.Y.S. 2d 369, 234 N.E. 2d 422 (1967) [10] and instead adopted an ad hoc approach, illustrated by the following statement:
*245 “Here, defendant was repeatedly warned of his rights. He was given a written statement of all the warnings required by Miranda including the right to have counsel present during interrogation, and he was asked to read it aloud to insure that he would understand it. The interrogation sessions were short. There is no showing of trickery or cajolery. He had free access at all times to telephone. He visited with his attorney, members of his family, and his doctor between interrogation sessions. He made no request that his attorney be present during the interrogation sessions. He was not under medication. Finally, and most importantly, on at least five occasions throughout all three interrogation sessions, defendant declined to answer certain questions, thus selectively exercising his right to remain silent. Defendant’s exercise of his constitutional right to remain silent as to certain areas of questioning throughout the interrogation sessions is persuasive evidence of his continuing ability to make a free and rational choice, and lends strong support to the conclusion that any other rights [defendant] declined to exercise during the interrogation sessions were knowingly and intelligently waived”: State v. Adams, supra, at 671, 458 P. 2d at 571.
For a similar ad hoc approach see Taylor v. State, 282 Ala. 567, 213 So. 2d 566 (Ala., 1968).
In State v. Longmore, 178 Neb. 509, 134 N.W. 2d 66 (1965), the Nebraska Supreme Court had occasion to consider the admissibility of an in-custody statement taken from defendant in circumstances involving factors similar to those in the present case. Defendant was in a cafe-filling station where his *246 wife was a waitress. When another patron called defendant’s wife obscene names, defendant complained to the proprietor, and the patron was evicted. Later in the evening the patron returned, and again called defendant’s wife obscene names. In an ensuing scuffle, the patron was wounded in his neck, and as a result died. Defendant was taken into custody and questioned three times prior to a coroner’s inquest and released each time. At the inquest, defendant was represented by counsel. Almost a month later, defendant and his wife were interrogated, in the presence of their attorney, and were released. Later that day, however, defendant and his wife were charged with second degree murder and were arrested. At the time of the arrest, defendant was allowed to call his attorney to tell him of the arrest, and the sheriff told the attorney that defendant and his wife were being taken to jail. Defendant’s attorney told defendant to go along to jail and that he would be right there. Instead of taking defendant and his wife to the local jail, the sheriff took them to a jail 40 miles away. The sheriff refused to tell a friend of defendant where he was taking defendant. Similarly, the county attorney refused to tell defendant’s attorney where defendant was, although the county attorney knew. At the jail, defendant and his wife were questioned. The wife was questioned extensively. Then, defendant was questioned by a professional investigator, in the presence of several other law enforcement officers. He said that he did not want to answer any questions in the absence of his attorney. The investigator suggested to defendant that his attorney might not be representing him anymore. The investigator also threatened defendant and his wife with first degree murder charges unless defendant confessed. Knowing that his wife had been inter *247 rogated, and had been crying and was in poor health, defendant, upon being promised that his wife would be released if he confessed, wrote out a statement, which he then signed. Neither defendant nor his wife had been subjected to physical threats or violence. Defendant was not at any time during the interrogation advised of any rights he had, nor that he did not have to say anything. The court held that the statement was inadmissible, saying:
“All of the facts together indicate without any question that this was a secret interrogation, planned and prepared in advance, and deliberately excluding defendant’s known counsel”: State v. Longmore, 178 Neb. 509, 521, 134 N.W. 2d 66, 74 (1965).
Thus, it appears that to the extent that cases from other jurisdictions have considered the point and can be reconciled, the rule is, not that there can be no waiver of constitutional rights by a defendant represented by counsel except in the presence of counsel, but, rather, that when a defendant is represented by counsel, and there is evidence of “intention to victimize a defendant or outwit his attorney” (People v. Robles, supra, at 159, 314 N.Y.S. 2d at 795, 263 N.E. 2d at 305) or of deceptive in-custody interrogation tactics (State v. Witt, supra at-, 422 S.W. 2d at 308) or of “trickery or cajolery” (State v. Adams, supra at 671, 458 P. 2d at 571) or deliberate exclusion of counsel (State v. Longmore, supra), the already heavy burden of proving that defendant has waived his constitutional rights becomes still heavier.
3. The law of Pennsylvania.
The case most pertinent in deciding what is the law of Pennsylvania is Commonwealth v. Harmon, 440 Pa. 195, 269 A. 2d 744 (1970). Indeed, the facts of that case are strikingly similar to the facts of the *248 present case, even to the extent of involving some of the same persons and investigative techniques. Defendant, who was 18 years old, was arrested at 6:30 a.m. at his parents’ home, and was taken to the Police Administration Building. After being warned of his rights to remain silent and to have counsel, he was questioned from about 8:30 a.m. to about 4:35 p.m., when he signed a written statement. During this period, he was given two lie detector tests, the first at about 9 a.m. and the second after he had made a brief oral statement shortly after 12:30 p.m. At 3:15 he was again warned of his rights to remain silent and to have counsel. While interrogating defendant, the police deliberately excluded his family and counsel. The court, by Mr. Justice Eagen, described this as follows:
“When Harmon was taken into police custody at his home during the early morning of August 23rd, both he and his mother requested of the arresting officers that she be permitted to accompany him to police headquarters, but these requests were refused. Harmon’s mother then arranged for private transportation and arrived at the Homicide Division in the Police Administration Building about the same time as her son. She immediately asked to see him, but the request was refused. Similar requests were repeated many, many times during the day, but the most favorable response she received was that she could see her son soon. This ‘soon’ finally turned out to be 6 p.m.
“While being questioned by the police, Harmon himself made repeated inquiries as to whether his mother or anyone else was there to see him, but the detectives ‘acted like they didn’t hear me . . .’
“About 11:30 a.m. on August 23, 1968, Robert Manley, a field representative for the Commission *249 on Human Relations who had worked with Harmon during the preceding months, upon being informed of Harmon’s arrest, visited the Homicide Division at police headquarters and requested permission to see him. He was told by Detective Sergeant Funk that he could see Harmon when the police ‘were finished with him.’ Manley then left police headquarters and attempted to obtain legal assistance for Harmon. About 3 p.m. he arrived back at police headquarters and his second request to see Harmon was refused.
“About 4:15 p.m. on August 23, 1968, Jeffrey A. Mintz, Esq., of the Public Defender’s Office arrived at police headquarters, and after talking with Harmon’s mother, he knocked at the door of the room where Harmon was being questioned and told a responding police officer that he represented Harmon, that he wanted to see his client and that he didn’t want him to make any statement. He was told to have a seat and to wait until he was called. Mintz, Manley and Harmon’s mother were finally granted permission to see Harmon at 6 p.m. At this time, Harmon appeared ‘washed out or drained’ and was ‘shaking, crying and burying his head in his hands . . .’: Commonwealth v. Harmon, supra at 197-99, 269 A. 2d at 745.
The Commonwealth argued that since defendant had not asked for an attorney, “there was no constitutional obligation on the part of the police to permit third persons (other than a lawyer Harmon personally requested) to ‘intrude’ upon the interrogation”: Commonwealth v. Harmon, supra at 199, 269 A. 2d at 745-46.
The court, however, considered it unnecessary to consider this argument, and in affirming the suppression of the written statement, simply said, without elaboration:
*250 “The facts found by the lower court, which are amply supported by the record, disclose the use of tactics in securing the challenged statement which we cannot condone. If for no more than fairness and policy, the suppression order should be affirmed”: Commonwealth v. Harmon, supra at 199, 269 A. 2d at 746.
Although the basis of this holding is not expressly stated, it is evident that it requires that defendant’s statement in the present case be suppressed. If the basis of the holding is the strict New York rule applied in People v. Arthur, supra, that “Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel . . .” (People v. Arthur, supra at 539, 292 N.Y.S. 2d at page 666, 239 N.E. 2d at page 539), suppression is required, for in the present case the police did question defendant, after they knew of Mr. Segal’s entry into the case, in Mr. Segal’s absence, and without defendant having waived, in Mr. Segal’s presence, his right to Mr. Segal’s counsel. If the basis of the holding is a narrower rule such as was applied in New York in People v. Robles, supra, and as seems to apply in Arizona and Missouri, still suppression is required, for in the present case the statements were not inititated by defendant, and did not represent an “impetuous unbosoming,” [11] nor was defendant’s attorney “physically present and available” to defendant “at all relevant times,” and there is evidence of “an inten *251 tion to victimize a defendant or outwit his attorney”: People v. Robles, supra at 159, 314 N.Y.S. 2d at 795-96, 263 N.E. 2d at 305-06. Finally, if the basis of the holding is the ad hoc approach reflected in the Washington, Alabama, and Nebraska cases that have been cited, again suppression is required, for in the present case the facts are stronger against waiver than in Commonwealth v. Harmon, supra, where defendant was not questioned for so long a period, and the exclusion of counsel was not so serious.
CONCLUSION OF LAW
The Commonwealth has not carried its burden of proving that defendant knowingly and intelligently waived his rights to remain silent and to have counsel.
ORDER
And now, May 26, 1971, defendant’s motion to suppress his statements to the police is granted.

 According to the detective, he warned defendant about 7:30 p.m., which, it will be observed, is inconsistent with Detective Cullen’s testimony that the test was not over until about 9:10 p.m.

 As will appear, according to Mr. Manley’s testimony, his call to defendant’s father must have been later than sometime between 9 p.m. and 10 p.m., for he did not learn of defendant’s whereabouts until 10:45 p.m.

 It will be recalled that according to the police chronology, defendant was not given food until 2 a.m., and that according to the testimony of Detectives Cullen and Scott, as well as of defendant, referred to supra, defendant was in the he detector test room, hooked up to the equipment, from about 7 p.m. until 1:20 a.m.

 According to the police chronology, Mr. Segal saw defendant at 1:25 a.m. Mr. Segal, however, testified that because he was angry — “no bones about it” — at being kept from seeing his client, he wrote down “the precise time” that he saw defendant, and that the police chronology was “absolutely incorrect.” Mr. Segal produced the envelope upon which, he testified, he wrote the exact times when he arrived at the Police Administration Building, when he was allowed to sign the building registry and was taken upstairs, and, finally, when he was allowed to see defendant. These times corroborated Mr. Segal’s earlier recollection of the times of these three events.

 Thus, the conversation was at about 2 a.m. It will be recalled that the police chronology has an entry that at 2 a.m., defendant was given food. Mr. Segal, however, testified that defendant was given no food at 2 a.m., and, moreover, that at no time while he was at Police Administration Building during that morning did he see defendant being given any food.

 Mr. Segal testified that he had made similar arrangements with the district attorney’s office in the past, where a client of his had information that appeared to be useful. If the information *219 proved not to be useful, the suspect had not damaged his defense or waived his rights by giving a statement that might be used against him at a later time.

 Defendant was wearing bedroom slippers; Mr. Segal asked that shoes be found for him, as the others in the line-up were wearing shoes. The other suggestions concerned the age and complexion of persons in the line-up.

 The testimony with respect to whether Mr. Segal was notified of the line-up is unclear. On crossexamination by Mr. Stevens, Mr. Segal said that he did not agree to defendant’s participation in the line-up. This would have been consistent with Mr. Segal’s conduct of the case. However, when Mr. Stevens “suggest [ed] ... as a fact that before the second line-up took place I spoke to you on the telephone and told you it was going to take place, and you said ‘Go ahead,’ Mr. Segal replied that 1 do not have a specific recollection of that. If that is your recollection, I would not doubt it . . .’ ” Mr. Stevens also suggested that “a contemporaneous [police] memorandum” stated that Mr. Segal had been notified, whereupon Mr. Segal said that “if that is your recollection, you are correct if you accept that. I would not quarrel with it . . .” He said that he had “a general apprehension” that he had telephoned Mr. Segal at “approximately 7 o’clock when the second line-up was held.” He did not testify what he said to Mr. Segal about the line-up.

 Some of the findings of fact will be accompanied by an explanatory comment, as, for example, where conflicts or uncertainties in the testimony are involved.

 Defendant in People v. Vella, supra, was arrested and arraigned in New York City for receiving stolen goods. After the arraignment, at which counsel was appointed, defendant was released on his own recognizance. Just as defendant was leaving the arraignment, he was arrested by New York State Police, who turned him over to the Suffolk County Police. The Suffolk police, in the absence of and without notice to the attorney appointed at the arraignment in New York City, warned defendant of his right to counsel, and after obtaining a waiver of the right, interrogated defendant regarding a burglary in Suffolk County as well as regarding the theft that was the subject of the New York City charge. The court of appeals held the interrogation impermissible, and the admission of the resulting confession into evidence at the trial on the burglary charge reversible error. Judge Keating, concurring in a separate opinion, joined by Judge Scileppi, criticized *245 the opinion of the court for failing to acknowledge that the Suffolk County charge was separate from the New York City charge, and thus, in his view, not affected by the appointment of the New York City attorney.

 Cf. Miranda v. Arizona, 384 U.S. 436, 478 (1966); People v. Taylor, 247 Cal. App. 2d 11, 13, 55 Cal. Rptr. 521, 523 (1966); People v. Kaye, 25 N.Y. 2d 139, 303 N.Y.S. 2d 41, 250 N.E. 2d 329 (1969); People v. Dorado, 62 Cal. 2d 338, 42 Cal. Rptr. 169, 398 P.2d 361 (1965); State v. Arrington, 2 Ohio St. 2d 172, 207 N.E. 2d 557 (1965).